```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UNITED STATES OF AMERICA  ) Docket No. A 08-CR-476(1) SS
                               )
 4   vs.                       ) Austin, Texas
                               )
 5   DUANE HOSEA, JR.          ) May 29, 2009

 6

                        TRANSCRIPT OF SENTENCING
 7              BEFORE THE HONORABLE SAM SPARKS

 8

 9   APPEARANCES:

10   For the United States:      Ms. Elizabeth Cottingham
                                 Assistant U.S. Attorney
11                               816 Congress Avenue, Suite 1000
                                 Austin, Texas 78701
12

13

14   For the Defendant:          Mr. Chris A. Blackerby
                                 Germer, Gertz, Beaman & Brown
15                               301 Congress Avenue, Suite 1700
                                 Austin, Texas 78701
16

17   Court Reporter:             Ms. Lily Iva Reznik, RPR, CRR
                                 200 West 8th Street
18                               Austin, Texas 78701
                                 (512)916-5564
19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Steve Hause | 4 | 27 | 40 | 49 |

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| (None.) | | |
| Defendant's | | |
| (None.) | | |

09:57:31

09:57:31

| | | |
|---|---|---|
| 09:57:36 | 1 | THE COURT:  08-CR-476, United States vs. Duane Hosea. |
| 09:57:42 | 2 | MS. COTTINGHAM:  Elizabeth Cottingham for the United |
| 09:57:48 | 3 | States. |
| 09:57:48 | 4 | MR. BLACKERBY:  Chris Blackerby for Mr. Hosea. |
| 09:58:24 | 5 | THE COURT:  State your name, please, sir. |
| 09:58:26 | 6 | THE DEFENDANT:  Duane Scott Hosea, Jr. |
| 09:58:30 | 7 | THE COURT:  Mr. Hosea, have you had the opportunity to |
| 09:58:34 | 8 | go over with Mr. Blackerby the presentence investigation made in |
| 09:58:36 | 9 | your case? |
| 09:58:37 | 10 | THE DEFENDANT:  Yes, sir. |
| 09:58:43 | 11 | THE COURT:  The probation department has recommended an |
| 09:58:45 | 12 | offense level adjusted of 40, with a criminal history of II, for |
| 09:58:53 | 13 | a guideline range of 324 to 405 months on Count 1.  Count 2 is a |
| 09:59:02 | 14 | consecutive sentence of not less than 34 months. |
| 09:59:10 | 15 | I have several objections by the government, but I |
| 09:59:17 | 16 | believe they have all been corrected before I got the |
| 09:59:21 | 17 | presentence.  I've got one, they were granted.  I've got one |
| 09:59:25 | 18 | objection on the offense level that Mr. Hosea should be |
| 09:59:34 | 19 | responsible for less than 50 kilograms of cocaine, not the amount |
| 09:59:39 | 20 | calculated by the probation department. |
| 09:59:41 | 21 | Mr. Blackerby, do you wish to present any evidence on |
| 09:59:44 | 22 | that? |
| 09:59:45 | 23 | MR. BLACKERBY:  We do, your Honor.  We'd like to call |
| 09:59:47 | 24 | Agent Steve Hause. |
| 09:59:51 | 25 | THE COURT:  Be sworn, please, sir. |

| | | |
|---|---|---|
| 09:59:53 | 1 | (Witness sworn.) |
| 10:00:05 | 2 | STEVE HAUSE, called by the Defendant, duly sworn. |
| 10:00:05 | 3 | DIRECT EXAMINATION |
| 10:00:06 | 4 | BY MR. BLACKERBY: |
| 10:00:06 | 5 | Q.   Would you state your name?  I'm sorry.  Agent Hause, how are |
| 10:00:15 | 6 | you? |
| 10:00:15 | 7 | A.   Good.  My name is Steve Hause, H-A-U-S-E. |
| 10:00:21 | 8 | Q.   And as I understand it, you are one of the investigators |
| 10:00:25 | 9 | that's been in charge of this investigation; is that right? |
| 10:00:27 | 10 | A.   Yes, sir. |
| 10:00:27 | 11 | Q.   You're a special agent with the FBI, true? |
| 10:00:30 | 12 | A.   Yes, sir. |
| 10:00:30 | 13 | Q.   And you -- this investigation of Mr. Hosea goes back to some |
| 10:00:35 | 14 | time in the 2005 time period; is that right? |
| 10:00:37 | 15 | A.   Yes, sir. |
| 10:00:38 | 16 | Q.   And based upon your involvement in this case, you are |
| 10:00:40 | 17 | familiar with the investigation back to that time period; is that |
| 10:00:42 | 18 | right? |
| 10:00:42 | 19 | A.   Yes, sir. |
| 10:00:43 | 20 | Q.   Prior to 2005, it's true that Mr. Hosea was in college; is |
| 10:00:49 | 21 | that true? |
| 10:00:49 | 22 | A.   At some point. |
| 10:00:51 | 23 | Q.   He was playing football, he went to OSU and some various |
| 10:00:55 | 24 | other colleges up until approximately the summer of 2004.  Is |
| 10:00:59 | 25 | that consistent with what you know? |

```
10:01:01   1   A.   I'm not sure of the dates, but I know he went to several
10:01:04   2   schools.
10:01:04   3   Q.   Okay.  But at any rate, the investigation you have reveals
10:01:08   4   that the criminal activity that we're here about today started
10:01:12   5   sometime in the 2005 time period; is that right?
10:01:14   6   A.   Yes.
10:01:14   7   Q.   All right.  Have you read the presentence investigation
10:01:19   8   report?
10:01:19   9   A.   No.
10:01:20  10   Q.   Are you familiar with what it says?
10:01:22  11   A.   No.
10:01:23  12        THE COURT:  He better not be.  He's not permitted to
10:01:26  13   read the presentence report.
10:01:29  14   Q.   (BY MR. BLACKERBY) If the amount -- let me ask you this.
10:01:35  15        In terms of the amount of drugs that Mr. Hosea should
10:01:39  16   be held responsible for, in your opinion, based upon your
10:01:42  17   investigation, what is that amount?
10:01:44  18   A.   What is that amount?
10:01:46  19   Q.   Uh-huh.
10:01:50  20   A.   Well, I've quantified it in a number of different ways, but
10:01:56  21   since 2005, it's well over 150 kilos.
10:01:59  22   Q.   So just over 150 kilos.
10:02:01  23   A.   I'm not saying it's just over, I'm saying it's well over.
10:02:04  24   Q.   Well over.  Do you have any -- in terms of well over, do you
10:02:07  25   have any better estimate over how much over 150?
```

| | | |
|---|---|---|
| 10:02:42 | 1 | A.   I would say closer to -- if you're asking for an estimate, |
| 10:02:47 | 2 | 250, 300 or more. |
| 10:02:52 | 3 | Q.   Somebody came in and said 470 kilos, you think that would |
| 10:02:56 | 4 | not be correct essentially? |
| 10:03:01 | 5 | A.   I don't know.  I would have to see the calculations. |
| 10:03:05 | 6 | Q.   That would not be consistent with your calculation, right? |
| 10:03:07 | 7 | A.   Well, from the cooperating witnesses and defendants and |
| 10:03:14 | 8 | other investigation, they were quite consistent in the quantities |
| 10:03:21 | 9 | in 2005 and 2006, that would probably be over 150 kilos, just in |
| 10:03:26 | 10 | those years alone, each year. |
| 10:03:28 | 11 | Q.   Let me see if I can go at it this way. |
| 10:03:31 | 12 |          In terms of trying to determine -- Mr. Hosea's |
| 10:03:34 | 13 | obviously pled to the fact that he was involved in this activity. |
| 10:03:37 | 14 | We're here today to determine how much drugs he should be held |
| 10:03:41 | 15 | responsible for.  You understand that? |
| 10:03:42 | 16 | A.   Yes, sir. |
| 10:03:42 | 17 | Q.   And in trying to calculate those amounts, there's, I guess, |
| 10:03:46 | 18 | certain pieces of evidence that you can look at to try to make |
| 10:03:48 | 19 | that determination.  Would you agree with that? |
| 10:03:50 | 20 | A.   Yes, sir. |
| 10:03:50 | 21 | Q.   One of which would be interviews with cooperators, other |
| 10:03:54 | 22 | folks? |
| 10:03:55 | 23 | A.   Yes, sir. |
| 10:03:55 | 24 | Q.   And what they say can be corroborated by other pieces of |
| 10:03:58 | 25 | evidence, which would include wiretaps, right? |

| 10:04:01 | 1 | A.   Yes, sir. |
| 10:04:02 | 2 | Q.   It also could be corroborated by seizures that may have been |
| 10:04:07 | 3 | done -- |
| 10:04:08 | 4 | A.   Yes, sir. |
| 10:04:08 | 5 | Q.   -- by either Mr. Hosea or somebody related that worked for |
| 10:04:12 | 6 | them; is that true? |
| 10:04:13 | 7 | A.   Seizures of cash, cars, jewelry, cocaine, yes. |
| 10:04:15 | 8 | Q.   Right.  And the other part could be, kind of on that same |
| 10:04:18 | 9 | last topic, assets that you go in and you look at what assets or |
| 10:04:22 | 10 | what kinds of property somebody has, and if it matches up with |
| 10:04:26 | 11 | how much money they actually make in a job, or if it doesn't, |
| 10:04:28 | 12 | that might give you some indication of the amount of money they |
| 10:04:30 | 13 | have; is that true? |
| 10:04:31 | 14 | A.   It can give an indication. |
| 10:04:32 | 15 | Q.   And in this case, the quantities that you're talking about |
| 10:04:36 | 16 | when you talked about in excess of 150, maybe up to 350, that |
| 10:04:41 | 17 | estimate comes primarily from cooperators; is that true? |
| 10:04:46 | 18 | A.   I would say initially came from primarily cooperators, but |
| 10:04:52 | 19 | it was corroborated after that. |
| 10:04:53 | 20 | Q.   And how is that corroborated? |
| 10:04:55 | 21 | A.   Just by the things you're saying. |
| 10:04:56 | 22 | Q.   Okay.  Well, let's go talk about that.  In terms of let's |
| 10:04:59 | 23 | talk about, first, seizures.  The seizures of cocaine or |
| 10:05:03 | 24 | whatever.  Let's talk about seizures of cocaine, specifically. |
| 10:05:06 | 25 | A.   Okay. |

8

10:05:06  1   Q.   In terms of seizures from Mr. Hosea.

10:05:08  2   A.   Uh-huh.

10:05:09  3   Q.   There is not any kind of major kilogram seizure from him

10:05:12  4   personally.  Would you agree with that?

10:05:15  5   A.   Well, if he talked out of his hands or if he talked that

10:05:19  6   he's responsible for, if you could clarify that.

10:05:21  7   Q.   I'm talking, first of all, from Mr. Hosea personally.

10:05:26  8   A.   On November 18th, he had nine ounces of cocaine, which is a

10:05:30  9   quarter kilo.

10:05:31  10  Q.   Okay.  Certainly not a multi-kilogram amount?

10:05:34  11  A.   Not on that date.

10:05:36  12  Q.   Was there another date that you seized a multi-kilogram

10:05:39  13  amount from Mr. Hosea?

10:05:40  14  A.   In February of '07, we seized two kilograms from his driver.

10:05:46  15  Q.   We're talking about from Mr. Hosea first, and I'm going to

10:05:48  16  get to his driver in a second.  From Mr. Hosea, himself.

10:05:51  17  A.   Other than some marihuana, no, no cocaine of any substantial

10:05:56  18  amounts.

10:05:56  19  Q.   So nine ounces total in terms of a seizure from him

10:06:01  20  personally?

10:06:01  21  A.   Yes.

10:06:02  22  Q.   Okay.  Now, seizures from somebody who allegedly works for

10:06:06  23  him, you have a two-kilogram seizure; is that right?

10:06:10  24  A.   Yes.

10:06:10  25  Q.   And that was from, I believe, Mr. -- is that Showels?

| | | |
|---|---|---|
| 10:06:13 | 1 | A.   Antoine Showels. |
| 10:06:14 | 2 | Q.   Was that somebody who was allegedly going to one of these |
| 10:06:20 | 3 | trips to Louisiana? |
| 10:06:21 | 4 | A.   Yes. |
| 10:06:21 | 5 | Q.   All right.  And I think I remember you talking about these |
| 10:06:25 | 6 | trips to Louisiana.  They were estimated at some -- from four |
| 10:06:29 | 7 | kilograms to up to 15 kilograms, or something like that? |
| 10:06:34 | 8 | A.   They're estimated at four kilograms per trip up to ten |
| 10:06:38 | 9 | kilograms per trip and then, some occasionally more than ten, but |
| 10:06:43 | 10 | not consistently. |
| 10:06:44 | 11 | Q.   And so, this particular seizure, that was what cooperators |
| 10:06:48 | 12 | have told you; is that true? |
| 10:06:54 | 13 | A.   The seizures? |
| 10:06:55 | 14 | Q.   Yes -- no.  Cooperators had told you that the amounts that |
| 10:06:57 | 15 | were going to Louisiana per trip were, like, a four-kilogram, |
| 10:07:00 | 16 | sometimes up to 15 kilograms; is that right? |
| 10:07:02 | 17 | A.   In 2005-2006, yes. |
| 10:07:04 | 18 | Q.   Right.  And this particular seizure was outside of that |
| 10:07:09 | 19 | range, wasn't it? |
| 10:07:10 | 20 | A.   That was following a number of federal search warrants that |
| 10:07:12 | 21 | had been conducted where he was actually on television, |
| 10:07:16 | 22 | broadcasting the fact that law enforcement was looking at him. |
| 10:07:19 | 23 | That was in February of '07.  So it was after the 2005-2006.  So |
| 10:07:25 | 24 | yes, it was lower than the quantities that we're talking about. |
| 10:07:30 | 25 | Q.   So to be clear, the answer to my question is yes, it was |

10:07:32  1   lower than the four to 15 kilos?

10:07:34  2   A.   Yes.

10:07:35  3   Q.   All right.  I think there was one other stop that I've seen

10:07:39  4   some reference to by Mr. Sonnier; is that right?

10:07:41  5   A.   Yes.

10:07:42  6   Q.   Okay.  And I think at that point in time, he was charged

10:07:45  7   with 100 grams; is that right?

10:07:51  8   A.   If I could refer to my notes on the amount he was stuck

10:07:55  9   with.  168.7 grams of powder.

10:08:02  10  Q.   That was not any kind of multi-kilogram load on that

10:08:06  11  particular stop, was it?

10:08:08  12  A.   No.  I don't believe that was a mule -- I don't believe he

10:08:11  13  was a mule driving cocaine for Mr. Hosea in that case.  I believe

10:08:15  14  he had purchased that from Mr. Hosea for himself to sell.

10:08:18  15  Q.   There's no other stop or seizure that you have other than

10:08:21  16  Mr. Showels, then, of somebody that you think would corroborate

10:08:24  17  this multi-kilogram trip back and forth to Louisiana?

10:08:28  18  A.   As far as the stop and a substantial seizure of one of his

10:08:32  19  mules, no.

10:08:32  20  Q.   Okay.  So we talked about seizures.  We've got one,

10:08:36  21  two-kilogram seizure.  And then, the next piece of evidence we

10:08:40  22  have is potential wiretaps; is that true?

10:08:43  23  A.   Yes.

10:08:44  24  Q.   All right.  And you had a wiretap on Mr. Hosea for a period

10:08:48  25  of 60 days?

| | | |
|---|---|---|
| 10:08:50 | 1 | A.   Yes. |
| 10:08:50 | 2 | Q.   Okay.  And I think I've heard you say in another hearing |
| 10:08:57 | 3 | that wiretaps are a pretty effective way of observing what |
| 10:09:00 | 4 | somebody's doing, right? |
| 10:09:01 | 5 | A.   Yes. |
| 10:09:02 | 6 | Q.   In fact, I think I heard you say in Mr. Fennell's that that |
| 10:09:06 | 7 | gives you the best picture of what's going on? |
| 10:09:09 | 8 | A.   Well, each person whose phone you tap is different as to |
| 10:09:15 | 9 | what kind of a picture will be exposed.  I've had others that |
| 10:09:18 | 10 | say, come have a beer, and that could be a three-kilogram cocaine |
| 10:09:22 | 11 | transaction.  So it depends on the nature of the person |
| 10:09:27 | 12 | intercepted. |
| 10:09:27 | 13 | Q.   Did Mr. Hosea conduct some business on his cell phone? |
| 10:09:31 | 14 | A.   Yes, sir. |
| 10:09:31 | 15 | Q.   And were you able to intercept that business -- |
| 10:09:34 | 16 | A.   Yes. |
| 10:09:34 | 17 | Q.   -- conversations?  I think I saw some reference to, like, |
| 10:09:38 | 18 | 10,000 calls that were intercepted; is that true? |
| 10:09:40 | 19 | A.   Yes. |
| 10:09:40 | 20 | Q.   All right.  Now, in terms of the amount of drugs during |
| 10:09:44 | 21 | those 60 days you were able to document, were you able to |
| 10:09:48 | 22 | document the amount of drugs that were -- that went through Mr. |
| 10:09:52 | 23 | Hosea's hands during those 60 days? |
| 10:09:54 | 24 | A.   Up to some degree, yes. |
| 10:09:56 | 25 | Q.   What did you come up with? |

10:10:03   1   A.   More than five kilograms from October, including some

10:10:25   2   transactions with Mr. Fennell and Mr. Jackson on Mr. Fennell's

10:10:30   3   wiretap.  And when we initially began interception, which was

10:10:39   4   September 18th, the first thing we learned, there was a general

10:10:44   5   drought in Austin.  So from October 11th to the end of the

10:10:49   6   wiretap, which was about November 18th, with more than five

10:10:53   7   kilograms.

10:10:54   8   Q.   So for a two-month period on Mr. -- for Mr. Hosea, you got

10:10:59   9   five-kilogram amount for that two-month period that you could

10:11:02  10   document on?

10:11:03  11   A.   Well, yeah.  And that does not include anything that they

10:11:06  12   would refer to as dummy cocaine or anything like that.

10:11:09  13   Q.   Dummy cocaine for our purposes is something that's fake that

10:11:14  14   doesn't contain cocaine?

10:11:15  15   A.   I believe it contains a small amount of cocaine.

10:11:20  16   Q.   But in terms of true cocaine, you talked about five

10:11:23  17   kilograms in basically a two-month period; is that right?

10:11:26  18   A.   No.  Basically a little over a month.  Like I say, from

10:11:29  19   October 11th is when that calculation was made.

10:11:33  20   Q.   Okay.  So can you take us through the whole 60 days, what

10:11:37  21   the calculation is?

10:11:42  22   A.   Yes.  We have summaries of each and every call.  I could go

10:11:44  23   through each one and talk about what was going on in those

10:11:49  24   circumstances.  I could say that each and every day, any call

10:11:56  25   that we called pertinent was about either hydroponic marihuana,

10:12:01   1   cocaine, trying to get cocaine, crack, promethazine, other kinds

10:12:07   2   of, you know, prescription pills, things like that.  But you

10:12:15   3   know, I didn't go through and quantify it in that way other than

10:12:18   4   what I just said here, which is from October 11th.

10:12:20   5   Q.   If the probation office has gone through and quantified that

10:12:24   6   amount and come up with somewhere between six to eight kilograms,

10:12:27   7   would you disagree with that quantification?

10:12:29   8   A.   During the wire period?

10:12:31   9   Q.   Yes.

10:12:32  10   A.   No.  I wouldn't disagree with that.

10:12:33  11   Q.   And during that period, there were -- on a lot of those

10:12:36  12   calls when they were talking about certain amounts, there wasn't

10:12:39  13   just -- wasn't kilograms.  We're talking ounces during that time

10:12:42  14   period, as well; is that right?

10:12:44  15   A.   There were times, yeah, he would get quarter kilos and half

10:12:47  16   kilos, which you could call ounces.

10:12:49  17   Q.   If he were to talk about 2.5 sometime during that time

10:12:52  18   period, you don't know if you're talking about 2.5 kilos, 2.5

10:12:55  19   ounces?

10:12:55  20   A.   No.  I would know the difference.

10:12:56  21   Q.   Okay.  So at least if you take what you can document on the

10:13:09  22   wiretaps, that amount that you have been able to track is not

10:13:15  23   consistent with a five to 15 kilograms, twice-a-week rate.  It's

10:13:20  24   not consistent -- for whatever reason, it's not consistent with

10:13:22  25   that?

| 10:13:23 | 1 | A.   Well, the for whatever reason part is pretty important. |
| 10:13:25 | 2 | Q.   I'm sure Ms. Cottingham could get your explanation for that. |
| 10:13:29 | 3 | I'm just trying to find out -- |
| 10:13:30 | 4 | THE COURT:  Just answer the question. |
| 10:13:31 | 5 | A.   I'm sorry.  The six to eight would be accurate.  He did take |
| 10:13:38 | 6 | two trips to Louisiana the day after he got off his monitor, and |
| 10:13:43 | 7 | both times, he had just visited his supplier.  And true, we |
| 10:13:47 | 8 | weren't able to determine what he may have taken on those |
| 10:13:50 | 9 | occasions. |
| 10:13:50 | 10 | Q.   (BY MR. BLACKERBY) Right.  So we're trying to deal with the |
| 10:13:52 | 11 | evidence you have available? |
| 10:13:52 | 12 | A.   Yes, sir. |
| 10:13:52 | 13 | Q.   Okay.  Now, during that same time period, you had a wiretap |
| 10:13:58 | 14 | up on Warrior Fennell; is that right? |
| 10:14:00 | 15 | A.   His period was actually prior to Mr. Hosea's. |
| 10:14:04 | 16 | Q.   Okay.  It was same general time period, am I right?  There |
| 10:14:07 | 17 | was some overlap with those wiretaps? |
| 10:14:09 | 18 | A.   The wiretaps went from July 11 through November 15. |
| 10:14:13 | 19 | Q.   Okay.  And during Mr. Fennell's wiretap, if I remember your |
| 10:14:18 | 20 | testimony, you were able to document, I believe, something like |
| 10:14:21 | 21 | 111 kilograms of cocaine; is that right? |
| 10:14:26 | 22 | A.   Yes.  That sounds right. |
| 10:14:28 | 23 | Q.   And that's a little somewhat -- for whatever reason, that's |
| 10:14:31 | 24 | in contrast to what you have with Mr. Hosea where you have what |
| 10:14:35 | 25 | you've told us about, five kilograms for this a little bit over a |

10:14:38   1    month period?

10:14:39   2    A.    Yes.   That's true.

10:14:45   3    Q.    Now, I'm going to talk -- the other we've talked about

10:14:48   4    seizures.   We've got a two-kilogram seizure.   We've talked about

10:14:52   5    wiretaps.   We've got some documentation of up to maybe five

10:14:55   6    during the period of time that you can talk about.   And then, we

10:14:57   7    have our cooperators who have told us about various things; is

10:15:02   8    that right?

10:15:02   9    A.    Yes.

10:15:02   10   Q.    I've seen some estimate, again, that you say four to 15

10:15:06   11   kilograms, depending upon what time period going to Louisiana; is

10:15:10   12   that right?

10:15:10   13   A.    Yes.

10:15:11   14   Q.    All right.   And I believe that I remember in the hearing

10:15:15   15   that we had earlier in the month that some of these numbers were

10:15:19   16   kind of estimates based upon what six cooperators that you were

10:15:23   17   talking to?

10:15:24   18   A.    Yes.

10:15:24   19   Q.    So they weren't all giving you exactly the same amounts,

10:15:27   20   were they?

10:15:29   21   A.    A couple of them were consistent, but some were a little on

10:15:32   22   either side of the range.   Yes.

10:15:34   23   Q.    Right.   So in terms of how consistent they were kind of --

10:15:37   24   it's kind of a sliding scale.   They didn't all give you the same

10:15:39   25   number, although to a certain extent you may not expect that,

| | | |
|---|---|---|
| 10:15:43 | 1 | right? |
| 10:15:43 | 2 | A.   I wouldn't expect that for so many trips, no. |
| 10:15:46 | 3 | Q.   You never heard anybody say two kilograms.  Nobody ever told |
| 10:15:50 | 4 | you that, right? |
| 10:15:51 | 5 | A.   No.  Not during the '05 and '06 time period. |
| 10:15:57 | 6 | Q.   You understand that there was other reasons that Mr. Hosea |
| 10:16:05 | 7 | may have to go to Louisiana other than potentially transporting |
| 10:16:11 | 8 | drugs? |
| 10:16:11 | 9 | A.   Yes.  His wife, I believe, is from there and her family and |
| 10:16:15 | 10 | relatives. |
| 10:16:15 | 11 | Q.   And I think I believe that we talked about in the last |
| 10:16:17 | 12 | hearing that the people who were telling you this, and they're |
| 10:16:20 | 13 | extrapolating, aren't people who went with him on a regular |
| 10:16:23 | 14 | basis, true? |
| 10:16:24 | 15 | A.   I don't think anybody went on a regular basis. |
| 10:16:28 | 16 | Q.   So these are -- |
| 10:16:28 | 17 | A.   Some would go sometimes.  Some would overhear.  There was a |
| 10:16:36 | 18 | lot of reasons they had their knowledge. |
| 10:16:38 | 19 | Q.   In terms of their being able to estimate their amounts, the |
| 10:16:41 | 20 | regularity, how often, how much he took, that's in terms of over |
| 10:16:45 | 21 | a two-year period.  None of them went with him on a regular basis |
| 10:16:48 | 22 | to be able to extrapolate? |
| 10:16:50 | 23 | A.   Even if they went with him, they may not see anything. |
| 10:16:53 | 24 | Q.   Right. |
| 10:16:54 | 25 | A.   They learned from -- through other ways. |

| | | |
|---|---|---|
| 10:16:56 | 1 | Q.   Okay.  And you obviously understand from working in this |
| 10:16:59 | 2 | that the cooperators do have an incentive to feed you information |
| 10:17:02 | 3 | about folks; is that right? |
| 10:17:04 | 4 | A.   Their only incentive is to tell the truth.  That's all that |
| 10:17:09 | 5 | we'll accept. |
| 10:17:11 | 6 | Q.   But obviously you understand that from a cooperator's |
| 10:17:14 | 7 | perspective, if they give you somebody who's a bigger fish, they |
| 10:17:17 | 8 | think they're going to get more credit for that.  Would you agree |
| 10:17:19 | 9 | with that? |
| 10:17:20 | 10 | A.   Yes.  They'll get credit if they provide truthful |
| 10:17:23 | 11 | information. |
| 10:17:25 | 12 | Q.   And I know that you understand that, you know, based upon |
| 10:17:29 | 13 | your work and I know you're a conscientious agent, you're not out |
| 10:17:32 | 14 | there to try to get somebody based upon reputation; is that |
| 10:17:37 | 15 | right? |
| 10:17:37 | 16 | A.   Yes. |
| 10:17:38 | 17 | Q.   And Mr. Hosea had a reputation.  Would you agree with that? |
| 10:17:41 | 18 | A.   Yes. |
| 10:17:41 | 19 | Q.   All right.  He had a reputation as a football player, people |
| 10:17:45 | 20 | knew him from around town, he's from Austin; is that true? |
| 10:17:48 | 21 | A.   Yeah.  Everybody knew that he played football. |
| 10:17:51 | 22 | Q.   And in terms of trying to address whether or not these |
| 10:17:56 | 23 | cooperators were telling you -- you know, were being consistent, |
| 10:18:02 | 24 | were being truthful, one of the things is they all kind of give |
| 10:18:05 | 25 | you the same general story, right? |

10:18:06  1   A.   Yes.

10:18:06  2   Q.   Which was he moved kilograms from -- the ranges vary from

10:18:09  3   four all the way up to 15; is that right?

10:18:12  4   A.   Well, yes, but that's a wide range.  Some said sometimes

10:18:18  5   there were more than 10 on a given trip.  Maybe as many as 15.

10:18:24  6   That's not consistently what they said.

10:18:26  7   Q.   You're aware, though, that he could have that general

10:18:29  8   reputation and they could tell you that information; is that

10:18:33  9   right?

10:18:33  10  A.   Oh, no.  Only people in the know would know about that.  He

10:18:39  11  can have a reputation driving fancy cars and being a football

10:18:43  12  player; but other than that, only people who know would have

10:18:45  13  information on it.

10:18:46  14  Q.   By the way, you've told us and we've heard instances of dry

10:18:50  15  periods; is that right?

10:18:50  16  A.   Yes.

10:18:51  17  Q.   And some of those estimates may not incorporate dry periods;

10:18:54  18  is that true?

10:18:57  19  A.   Yes.  That's true after the 2005-2006 period.

10:19:01  20  Q.   Now, you just mentioned driving fancy cars.  Let's talk

10:19:08  21  about the last piece of evidence I think we talked about is

10:19:10  22  assets and how much assets somebody has and money they have

10:19:14  23  versus much money they could make at a job, right?

10:19:16  24  A.   Yes, sir.

10:19:18  25  Q.   And in this particular case, you know, when -- we have some

| | | |
|---|---|---|
| 10:19:22 | 1 | evidence about the value of a kilogram is from you and from |
| 10:19:28 | 2 | Detective DuBoise; is that right? |
| 10:19:30 | 3 | A.   Yes.  He's one of the investigators and he's actually more |
| 10:19:33 | 4 | on the Amador case. |
| 10:19:36 | 5 | Q.   Well, we heard from the last hearing we had that a |
| 10:19:39 | 6 | kilogram -- Mr. Hosea from you was selling a kilogram of cocaine |
| 10:19:43 | 7 | from 15 to $16,000 a kilogram; is that right? |
| 10:19:48 | 8 | A.   Yes.  And back then, it was probably, yeah, 14,000, 16,000, |
| 10:19:52 | 9 | in that range, depending on who the customer was. |
| 10:19:55 | 10 | Q.   One of the things that was interesting, that same hearing, |
| 10:19:57 | 11 | Detective DuBoise got up and testified before you, he said a |
| 10:20:00 | 12 | kilogram of cocaine was selling in Austin for 25 grand? |
| 10:20:03 | 13 | A.   That's recent prices, yes. |
| 10:20:05 | 14 | Q.   Okay.  So that's something that inflation has hit us; is |
| 10:20:08 | 15 | that right? |
| 10:20:08 | 16 | A.   Yeah.  A lack of supply and -- |
| 10:20:10 | 17 | Q.   And when did that price go up? |
| 10:20:12 | 18 | A.   It actually went up during the period of our wiretap when we |
| 10:20:16 | 19 | started initially.  Depending on the quality, it was 16,000, and |
| 10:20:21 | 20 | at the end of the wiretap, it was 25,000. |
| 10:20:23 | 21 | Q.   Okay.  Well, then, let's go with the lower number, 15,000, |
| 10:20:28 | 22 | you know, just for if you're talking about -- |
| 10:20:30 | 23 | A.   Okay. |
| 10:20:31 | 24 | Q.   -- a distribution from Mr. Hosea of, say, we'll pick out a |
| 10:20:37 | 25 | number that's somewhere that's 450 kilogram -- no.  Let's just |

10:20:42  1   say we'll stick with a number.  And I'm not pulling this out of

10:20:45  2   the air, but it's 460 kilos.  If he had distributed 470 kilos at

10:20:49  3   $15,000 a kilo, do you know how much money that is?

10:20:52  4   A.   I could multiply it.  But no, I don't know.

10:20:54  5   Q.   It's over $7 million; is that right?  Would you trust my

10:20:58  6   calculation?

10:21:01  7   A.   Yeah, if you had that many kilos stacked in a room and you

10:21:05  8   either -- and you paid for them at that time.  But when you buy

10:21:08  9   one here, one there, one here, one there, one here, one there,

10:21:12  10  the money interchanges, so it kind of negates it and all you keep

10:21:16  11  is the profits.

10:21:17  12  Q.   I'm just talking about -- I'm going to go to the profits

10:21:19  13  here in a minute.

10:21:20  14  A.   Okay.

10:21:20  15  Q.   I'll first talk about the amount of money that's flowing

10:21:24  16  through, how much the value of the actual cocaine you're dealing

10:21:26  17  with, okay?  So if a kilo of cocaine is worth $15,000 and Mr.

10:21:30  18  Hosea has dealt with 470 kilos of cocaine through, roughly, two,

10:21:35  19  two-and-a-half-year period, that's over $7 million; is that

10:21:39  20  right?

10:21:39  21  A.   In and out, yes.

10:21:40  22  Q.   Okay.  And in terms of what you told us, I think on the

10:21:43  23  stand, I know you were a little -- you didn't have your -- you

10:21:47  24  were somewhat reticent, but you said a profit for him on a kilo

10:21:51  25  was five to 1,500 -- or a profit for a kilo is five to 1,500?

| | | |
|---|---|---|
| 10:21:56 | 1 | A.   I think when pressed, I said I wasn't comfortable talking |
| 10:21:59 | 2 | about profits, but I did say those numbers. |
| 10:22:01 | 3 | Q.   Okay.  And I agree with that.  But let's take your $1,500 |
| 10:22:05 | 4 | number just for purposes of we've got to have one if we're |
| 10:22:09 | 5 | looking at the evidence that we have before us and trying to |
| 10:22:10 | 6 | figure out how much money he might have made.  If we take the |
| 10:22:13 | 7 | $1,500 number that he made for a kilo. |
| 10:22:16 | 8 | A.   Yes. |
| 10:22:16 | 9 | Q.   If he were distributing 470 kilos, that's, roughly, |
| 10:22:22 | 10 | $700,000, is that right, profit if that was how much profits? |
| 10:22:26 | 11 | A.   Yes. |
| 10:22:26 | 12 | Q.   All right.  And that's not -- most people who sell drugs |
| 10:22:29 | 13 | don't pay taxes on that; is that right? |
| 10:22:31 | 14 | A.   Yes. |
| 10:22:31 | 15 | Q.   So that's the equivalent maybe of somebody out there making |
| 10:22:34 | 16 | a salary of about a million bucks, give or take? |
| 10:22:38 | 17 | A.   Are you talking over per year or over the entire? |
| 10:22:41 | 18 | Q.   Over the course of two to two-and-a-half years, whatever the |
| 10:22:43 | 19 | amount. |
| 10:22:43 | 20 | A.   Since '05? |
| 10:22:44 | 21 | Q.   Yes. |
| 10:22:45 | 22 | A.   I trust your math at the 700,000. |
| 10:22:47 | 23 | Q.   All right.  Now, let's talk about the assets that Mr. Hosea |
| 10:22:51 | 24 | has and you're aware of.  You've become familiar with the assets |
| 10:22:55 | 25 | that he has, true? |

| | | |
|---|---|---|
| 10:22:55 | 1 | A.   Somewhat. |
| 10:22:56 | 2 | Q.   All right.  He owns a house? |
| 10:22:57 | 3 | A.   I don't know if he's leasing to own or owns. |
| 10:23:02 | 4 | Q.   Okay. |
| 10:23:03 | 5 | A.   He's paying a mortgage. |
| 10:23:04 | 6 | Q.   Is it a big house? |
| 10:23:06 | 7 | A.   Yeah.  It's pretty big. |
| 10:23:07 | 8 | Q.   How big is it? |
| 10:23:08 | 9 | A.   I don't know the square footage. |
| 10:23:10 | 10 | Q.   It's not like a big mansion? |
| 10:23:11 | 11 | A.   It's not a mansion. |
| 10:23:13 | 12 | Q.   By the way, you stated the sentence -- the prior hearing |
| 10:23:17 | 13 | that we had that he had no gainful employment during this time |
| 10:23:20 | 14 | period.  Do you remember that? |
| 10:23:21 | 15 | A.   Yes. |
| 10:23:21 | 16 | Q.   He does have ways of making money outside of selling drugs, |
| 10:23:25 | 17 | right? |
| 10:23:38 | 18 | A.   Let me think of it outside of selling drugs.  He would say |
| 10:23:44 | 19 | that he buys and sells cars. |
| 10:23:46 | 20 | Q.   You have some evidence of that; isn't that right? |
| 10:23:48 | 21 | A.   Yes. |
| 10:23:49 | 22 | Q.   There's an Avalanche that he sold to somebody, and you have |
| 10:23:51 | 23 | evidence that that is, in fact, what he did, true? |
| 10:23:53 | 24 | A.   Or he sold it for cocaine money, which makes it not |
| 10:23:58 | 25 | legitimate to me. |

| | | |
|---|---|---|
| 10:23:59 | 1 | Q.    I'm just talking about -- |
| 10:24:00 | 2 | A.    Yes, sir. |
| 10:24:00 | 3 | Q.    He sold an Avalanche and somebody paid him with cash; is |
| 10:24:07 | 4 | that right? |
| 10:24:07 | 5 | A.    I've heard conflicting stories. |
| 10:24:08 | 6 | Q.    But you understand that he does -- at least he has said and |
| 10:24:11 | 7 | you have some evidence that he does buy and sell cars, true? |
| 10:24:15 | 8 | A.    Yes. |
| 10:24:15 | 9 | Q.    Had you ever heard about a company he had, called Dynamic |
| 10:24:19 | 10 | Spoiler, where he sold rims and spoilers and that kind of thing? |
| 10:24:22 | 11 | A.    I've heard of that company. |
| 10:24:23 | 12 | Q.    So he had some other ways of generating cash other than the |
| 10:24:26 | 13 | sale of cocaine.  Would you agree with that? |
| 10:24:30 | 14 | A.    Buying and selling cars, yeah, I would say he made some |
| 10:24:35 | 15 | money there. |
| 10:24:36 | 16 | Q.    And how much he made, you don't know, do you? |
| 10:24:39 | 17 | A.    No. |
| 10:24:39 | 18 | Q.    Okay.  Now, let's talk about there's been some seizures of |
| 10:24:44 | 19 | some vehicles.  I know you went through them at one of the |
| 10:24:47 | 20 | hearings.  I think you went through, like, eight vehicles that |
| 10:24:49 | 21 | were seized? |
| 10:24:50 | 22 | A.    Yes. |
| 10:24:51 | 23 | Q.    And I think that there was referred to them as flashy |
| 10:24:55 | 24 | vehicles, flashy cars that he had? |
| 10:24:57 | 25 | A.    Some were and some weren't. |

| | | |
|---|---|---|
| 10:24:58 | 1 | Q.   One of them was a 2005 Chrysler 300; is that true? |
| 10:25:02 | 2 | A.   Yes. |
| 10:25:02 | 3 | Q.   That was in his name and his uncle's name; is that true? |
| 10:25:05 | 4 | A.   Yes. |
| 10:25:06 | 5 | Q.   And they actually purchased that from the Chrysler |
| 10:25:08 | 6 | dealership and had a note on it, were making payments? |
| 10:25:10 | 7 | A.   Yes. |
| 10:25:11 | 8 | Q.   He owed money.  It wasn't like he went in and paid cash for |
| 10:25:14 | 9 | it.  He owed something, like $27,000 to the dealership on that, |
| 10:25:16 | 10 | didn't he? |
| 10:25:17 | 11 | A.   He used his uncle's money as a straw buyer in that case. |
| 10:25:20 | 12 | Q.   But he paid for it with a loan; is that true? |
| 10:25:24 | 13 | A.   His uncle got a loan and Mr. Hosea was paying him cash. |
| 10:25:28 | 14 | Q.   He didn't come in and plop down $30,000 for a vehicle, did |
| 10:25:32 | 15 | he? |
| 10:25:32 | 16 | A.   Not on that car. |
| 10:25:33 | 17 | Q.   Okay.  The other -- another vehicle he had was a 2000 |
| 10:25:39 | 18 | Mercedes, right? |
| 10:25:40 | 19 | A.   Yes. |
| 10:25:40 | 20 | Q.   That had 106,000 miles? |
| 10:25:42 | 21 | A.   Yes.  A lot of them had high mileage. |
| 10:25:44 | 22 | Q.   Right.  He purchased that for $15,000, still owed 6,500. |
| 10:25:48 | 23 | Are you aware of that? |
| 10:25:50 | 24 | A.   I wouldn't disagree. |
| 10:25:52 | 25 | Q.   Another flashy automobile was a '97 Nissan Quest mini-van |

10:25:57    1    that was in his mother's name?

10:25:58    2    A.   Yes, that she drove.

10:26:04    3    Q.   Purchased for 3,500?  Do you know how much he purchased that

10:26:08    4    for?

10:26:08    5    A.   I don't know.  I would have to review all the records from

10:26:11    6    the --

10:26:12    7    Q.   That was the --

10:26:12    8    A.   -- dealership, which is not a legitimate dealership.

10:26:15    9    Q.   But that was the one his mom drove, right?

10:26:18   10    A.   Yes.

10:26:19   11    Q.   '96 Mercedes, remember that one?

10:26:25   12    A.   I'd remember it by color.  There were a couple of Mercedes.

10:26:28   13    Q.   That was the one that had 200,000 miles on it?

10:26:33   14    A.   If it was the green one, I think I remember it.

10:26:36   15    Q.   You're familiar with the fact he purchased that for $2,000

10:26:40   16    for purposes of selling it, right?

10:26:44   17    A.   I couldn't say what he purchased it for.

10:26:45   18    Q.   Okay.  And then, there was another one that was listed was

10:26:50   19    an Impala -- Chevy Impala under the name of Marcus Dupree, right?

10:26:55   20    A.   Yes.

10:26:55   21    Q.   So that really shouldn't be attributed to Duane?

10:27:00   22    A.   I think so.

10:27:01   23    Q.   Why is that?

10:27:04   24    A.   Well, what I know about that car is it was seized and

10:27:07   25    forfeited to the government for having been purchased with drug

```
10:27:10   1    proceeds.  And I also know it's common he would buy and sell cars
10:27:16   2    but not put them in his name, other than the Chrysler 300 that
10:27:19   3    you're talking about, which is the only, on paper, legitimate car
10:27:24   4    that I ever saw purchased.  He went to the auctions
10:27:27   5    illegitimately, worked with that dealer illegitimately, and most
10:27:35   6    of the cars are under somebody else's name.
10:27:38   7    Q.    The other one was a Land Rover; is that right?
10:27:41   8    A.    There was a Land Rover.
10:27:42   9    Q.    It wasn't a new Land Rover, it was a '99 Land Rover, right?
10:27:47  10    A.    If I had a list of the cars I did that day, I could confirm.
10:27:52  11    But yes, I hear what you're saying.
10:27:53  12    Q.    It wasn't a new model Land Rover?
10:27:56  13    A.    No.  Right.
10:27:56  14    Q.    So most of the cars -- you agree with me, at least, that
10:27:58  15    most of the cars that were listed to the extent you hear this
10:28:00  16    list and say, boy, he's got all these vehicles, most of these
10:28:03  17    cars were older vehicles, high mileage, some of which he had paid
10:28:06  18    for with getting loans; is that right?
10:28:09  19    A.    The only loan I know about is that legitimate loan was the
10:28:12  20    Chrysler 300.  But yes, he purchased them salvage title cars, you
10:28:17  21    know, cars that had previously been, you know, considered
10:28:22  22    damaged, high mileage, everything else.  Yes.  They looked good
10:28:26  23    on the outside but maybe not so much on the inside.
10:28:28  24    Q.    And in terms of the value of these vehicles, have you ever
10:28:32  25    figured up what the value of them was?
```

```
10:28:34   1   A.   Yes.  The cars that we seized have been appraised at
10:28:46   2   $75,038.
10:28:54   3   Q.   Your Honor, that's all the questions.  Pass the witness.
10:28:57   4          THE COURT:  Ms. Cottingham.
10:28:59   5          MS. COTTINGHAM:  Thank you, your Honor.
10:29:01   6                    CROSS-EXAMINATION
10:29:02   7   BY MS. COTTINGHAM:
10:29:02   8   Q.   Agent Hause, I'd first like to draw your attention to the
10:29:11   9   years 2005 and 2006, which you have already testified as being
10:29:16  10   the largest drug-dealing years of Mr. Hosea.
10:29:21  11          First, going to cooperating witnesses.  Have you had a
10:29:24  12   number of different cooperating witnesses in this case?
10:29:27  13   A.   Yes.
10:29:28  14   Q.   And are those people interviewed separately?
10:29:31  15   A.   Yes.
10:29:31  16   Q.   Are they told what the other cooperators say?
10:29:34  17   A.   No.
10:29:35  18   Q.   In interviewing these numerous cooperating witnesses, were
10:29:38  19   you able to corroborate details of their information such that
10:29:42  20   you believe that they are reliable and credible witnesses?
10:29:44  21   A.   Yes.
10:29:45  22   Q.   And part of that corroboration would also be that a number
10:29:48  23   of other individuals, interviewed separately without access to
10:29:51  24   each other's statements, confirm the details; is that correct?
10:29:55  25   A.   Yes.
```

10:29:55  1  Q.   And in dealing with these cooperating witnesses, I believe

10:29:59  2  you testified that during 2005 to 2006, that there were multi

10:30:05  3  kilograms per week that Mr. Hosea was dealing?

10:30:08  4  A.   Yes.

10:30:09  5  Q.   With the low of approximately how much per week?  I mean an

10:30:16  6  off week would be how much?

10:30:17  7  A.   Per trip, four is the lowest that I heard that he would take

10:30:20  8  to Louisiana, not counting what he distributed in Austin.

10:30:23  9  Q.   And then, if he had a higher week, it could go up to how

10:30:28 10  much, at the most?

10:30:29 11  A.   Ten or 15.

10:30:31 12  Q.   Okay.

10:30:32 13  A.   To Louisiana.

10:30:33 14  Q.   That would be the time period of 2005 and 2006?

10:30:38 15  A.   Yes.

10:30:38 16  Q.   Each of which we could get the minimum of 150 kilos or more

10:30:42 17  of cocaine, which is the highest category.  The 470 obviously

10:30:45 18  doesn't really affect once you get over 150?

10:30:48 19  A.   Yes.

10:30:48 20       THE COURT:  Do you need a witness?

10:30:50 21  Q.   (BY MR. COTTINGHAM) I apologize, your Honor.

10:30:51 22       I'd like to direct your attention to Overt Act 14 of

10:30:56 23  the superseding indictment, which is in reference to the

10:30:58 24  September 21, 2008 phone call that was intercepted of Mr. Hosea

10:31:03 25  where it talks about -- and Mr. Hosea's own words discuss

| | | |
|---|---|---|
| 10:31:07 | 1 | sticking his drug customer for 160,000 in bad cocaine. |
| 10:31:11 | 2 | Now, $160,000, approximately how many kilos would that |
| 10:31:16 | 3 | be?  I mean it's 16,000 a kilo, would that be -- |
| 10:31:24 | 4 | A.   Sure, 10 kilos. |
| 10:31:26 | 5 | Q.   -- 10 kilos? |
| 10:31:26 | 6 | A.   Yes. |
| 10:31:27 | 7 | Q.   Now, that's in Mr. Hosea's that you intercepted on his |
| 10:31:30 | 8 | wiretap? |
| 10:31:30 | 9 | A.   Yes. |
| 10:31:31 | 10 | Q.   And in that phone call intercepted there, also, he stated |
| 10:31:34 | 11 | that he lost a $60,000-to-$70,000-a week customer? |
| 10:31:39 | 12 | A.   Yes. |
| 10:31:40 | 13 | Q.   Now, that's Mr. Hosea's words.  Did you find that those |
| 10:31:44 | 14 | words corroborated the statements of your cooperators that Mr. |
| 10:31:47 | 15 | Hosea was dealing multi kilograms per week of cocaine? |
| 10:31:52 | 16 | A.   Yes.  They talked about that same person that they took for |
| 10:31:56 | 17 | $160,000 as being one of the ones that consistently come up with |
| 10:32:02 | 18 | 45 to $60,000, every time he went down there. |
| 10:32:08 | 19 | Q.   Now, let's talk about other ways that we corroborate other |
| 10:32:11 | 20 | than Mr. Hosea's own words on the wiretap, the cooperators in |
| 10:32:15 | 21 | this case. |
| 10:32:15 | 22 | Directing your attention to the March 9, 2006 search |
| 10:32:19 | 23 | warrant at the Blaine Road address.  Was there a kilo press that |
| 10:32:25 | 24 | was seized from that location? |
| 10:32:26 | 25 | A.   Yes. |

10:32:26   1   Q.   Would you explain what a kilo press is?

10:32:29   2   A.   It's a fabricated metal contraption that is able to

10:32:39   3   pressurize cocaine through pressure.

10:32:43   4   Q.   And what quantities of cocaine?

10:32:46   5   A.   Generally, normally it's used for kilos.  They're called

10:32:51   6   kilo presses for kilograms.

10:32:53   7   Q.   So your seizure on March 9, 2006, did that help corroborate

10:32:58   8   that Mr. Hosea was involved in kilo-level quantities of cocaine?

10:33:05   9   A.   Yes.  At that house was not only the press but the

10:33:11   10   packaging, you know, plastic wrap, Pyrex, scales, a lot of things

10:33:18   11   indicative of packaging, processing cocaine.

10:33:22   12   Q.   Directing our attention -- Mr. Blackerby asked you about the

10:33:27   13   stop of Mr. Sonnier back on September 13th of 2006.  Now, the

10:33:32   14   amount of cocaine that was recovered on that stop, was some of

10:33:36   15   the cocaine lost just due to the fact that -- of the unusual

10:33:41   16   circumstances of that stop?

10:33:42   17   A.   Yes.  While he was being pulled over, he tried to conceal it

10:33:45   18   in his pants, and it flowed down his leg when he got out of the

10:33:50   19   car and blew away from the wind.  Yeah.

10:33:53   20   Q.   So all we know is about the 168 grams that was recovered

10:33:56   21   from that?

10:33:56   22   A.   Yes.

10:33:57   23   Q.   Now, you also stated that you did not believe, though, that

10:33:59   24   this was a transport of cocaine to Louisiana.  What exactly do

10:34:05   25   you believe Mr. Sonnier's role to be?

```
10:34:07   1   A.   He was the person with the connections or one of the people
10:34:12   2   with connections in Crawley, Louisiana, the connections being the
10:34:18   3   distributors there.
10:34:18   4          THE COURT:  Mark your spot.  Excuse me, I'm sorry, mark
10:34:21   5   your spot.  We're going to take a ten-minute break.  Ten-minute
10:34:24   6   break.
10:34:44   7          (Recess.)
10:45:49   8          THE COURT:  Mr. Hause, you're still under oath, sir.
10:45:51   9          THE WITNESS:  Yes, sir.
10:45:52  10          THE COURT:  You may proceed.
10:45:53  11   Q.   (BY MR. COTTINGHAM) Agent Hause, we were talking about Juan
10:45:57  12   Carlos Treze Sonnier and the stop on him and what his role was.
10:46:01  13          Did you have information in reference to other people
10:46:04  14   being involved in transporting --
10:46:15  15          THE COURT:  It's a child crying.  It's a normal sound
10:46:17  16   that we hear every day.  Should not interrupt the court
10:46:20  17   proceeding.  Let's proceed.
10:46:23  18   Q.   (BY MR. COTTINGHAM) That there was other people responsible
10:46:26  19   for transporting the cocaine on that occasion?
10:46:29  20   A.   Yes.
10:46:31  21   Q.   And approximately how much cocaine did you hear that there
10:46:34  22   was available on the September 2006 time period when Mr. Sonnier
10:46:39  23   was arrested?
10:46:44  24   A.   The day before Mr. Sonnier was arrested, Mr. Hosea obtained
10:46:50  25   three or five kilograms of cocaine from his supplier, taking it
```

| | | |
|---|---|---|
| 10:46:54 | 1 | to the address at Sandy Side, where he broke it up and had it |
| 10:47:00 | 2 | shipped separately from Mr. Sonnier. |
| 10:47:06 | 3 | Q.   Then after Mr. Sonnier's arrest, was there another search |
| 10:47:11 | 4 | warrant?  We've already talked about the March 9th search warrant |
| 10:47:13 | 5 | of the Hosea residence. |
| 10:47:15 | 6 | Were there other search warrants that were conducted? |
| 10:47:17 | 7 | A.   Yes.  The day after Mr. Sonnier's arrest, there was another |
| 10:47:22 | 8 | search warrant conducted which we had planned to do prior to his |
| 10:47:26 | 9 | arrest. |
| 10:47:27 | 10 | Q.   You mentioned press attention and everything else that Mr. |
| 10:47:33 | 11 | Hosea was now being targeted by law.  Is that the incident where |
| 10:47:36 | 12 | you're saying it's now becoming very visible that things are |
| 10:47:39 | 13 | happening with Mr. Sonnier and he may be not with law |
| 10:47:42 | 14 | enforcement? |
| 10:47:42 | 15 | A.   Yes.  On most of the news channels, they had a crew out |
| 10:47:48 | 16 | filming his cars in the driveway that everybody knew his cars, |
| 10:47:52 | 17 | and yes, it was an announcement that law enforcement was looking |
| 10:47:58 | 18 | at him. |
| 10:48:00 | 19 | Q.   So as we're going into 2007, what effect is the increased |
| 10:48:08 | 20 | attention on Mr. Hosea having on the drug dealing to your |
| 10:48:11 | 21 | knowledge? |
| 10:48:12 | 22 | A.   Well, we continued to conduct investigation, it appeared |
| 10:48:19 | 23 | that he was what we would call laying low. |
| 10:48:26 | 24 | Q.   Laying low but still continuing with the drug dealing? |
| 10:48:29 | 25 | A.   I say laying low because this happened in September, but |

10:48:36  1  yes, we continued the investigation.  The drug dealing continued

10:48:41  2  and we believe picked up again early in '07.

10:48:45  3  Q.    Specifically, on February 19th of 2007, which is an incident

10:48:50  4  mentioned in the indictment, we talked about the two-kilo seizure

10:48:52  5  from Antoine Showels, and I believe the defense attorney asked

10:48:56  6  you about that, as well.

10:48:59  7        Did this indicate to you that your law enforcement

10:49:01  8  efforts were having some effect, if not obviously curtailing Mr.

10:49:05  9  Hosea's drug activity?

10:49:09  10  A.    Yes.  And you know, the fact that he was -- you know, common

10:49:17  11  knowledge in both circles that he was being investigated, we had

10:49:20  12  heard that, anyway.  A lot of people thought that he was not with

10:49:22  13  law enforcement because he was so active, why has he not been

10:49:28  14  caught.  People felt like he was cooperating with law

10:49:30  15  enforcement.  They also per his reputation didn't want to deal

10:49:34  16  with him.  So at this time he was having a little bit harder time

10:49:37  17  getting the quantities he had been getting.  At the same time, a

10:49:40  18  number of other arrests of the number of distributors who were

10:49:44  19  using his same suppliers, I would call them the group that sells

10:49:49  20  what we call Batman dope, which is cocaine with the Batman

10:49:52  21  insignia on it.  A lot of their distributors were arrested right

10:49:56  22  at that January-February 2007 time period thus causing the

10:50:01  23  suppliers to withdraw.

10:50:03  24        So there were a number of reasons that the normal

10:50:07  25  business as usual was not going on at that time.

```
10:50:09   1   Q.   So in other words, instead of having a minimum of four
10:50:12   2   kilos, you could understand why he might be down into two kilos
10:50:16   3   at that point?
10:50:16   4   A.   Yes.
10:50:17   5   Q.   In May 29 -- on May 29th of 2007, I'd like to go into the
10:50:23   6   50,000 cash seizure.  Would you explain a little bit about that?
10:50:26   7   A.   On that date, Pflugerville Police Department, independent of
10:50:32   8   anything we were doing, pulled him over for running a red light.
10:50:36   9   They noticed as he was stopping, he was stopping slowly and not,
10:50:41  10   you know, as quickly.  He's kind of going on and on with furtive
10:50:45  11   movements -- what they thought was furtive movements.  He was
10:50:48  12   making movements in the car, he was pulled over, had some
10:50:51  13   marihuana and 50,000 cash, strewn throughout the car.
10:50:56  14   Q.   Now, $50,000 in cash, approximately how many kilos can
10:51:02  15   $50,000 in cash purchase?
10:51:05  16   A.   Whatever that would be, 15 or 16,000, whatever his going --
10:51:10  17        THE COURT:  Y'all continue to press his ability at
10:51:13  18   math.
10:51:13  19        MS. COTTINGHAM:  Apologize, your Honor.
10:51:15  20        THE WITNESS:  I didn't eat a very big breakfast.
10:51:19  21        MS. COTTINGHAM:  I'm trying not to lead the witness.
10:51:20  22   So wouldn't that be at least three kilos of cocaine?
10:51:26  23   Q.   (BY MS. COTTINGHAM) Mr. Hause, so did that also help
10:51:29  24   corroborate to you that Mr. Hosea was still in the multilevel
10:51:34  25   distribution of cocaine, even in 2007, after his largest years of
```

10:51:39  1  2005 and 2006?

10:51:41  2  A.   Yes.  That was in May of 2007 that that happened.

10:51:47  3  Q.   Going to 2008 -- in June 9th of 2008, we have listed in the

10:51:56  4  indictment a pistol-whipping episode in which Mr. Hosea and Mr.

10:52:00  5  Dupree were arrested.

10:52:02  6       Did -- what effect did that incident have as far as on

10:52:06  7  Mr. Hosea?  Were his activities restricted in any way?

10:52:11  8  A.   Yes.  Following that incident, a search warrant was

10:52:15  9  conducted at his residence, and he was arrested and put in jail

10:52:21  10  and initially given a million-dollar bond, dropped down to

10:52:24  11  personal recognizance, but he was placed out on monitor.

10:52:28  12  Q.   So he's now on an electronic monitor?

10:52:30  13  A.   Yes.

10:52:31  14  Q.   And was he on an electronic monitor when the wiretap began?

10:52:35  15  A.   Yes.

10:52:37  16  Q.   Did it make it a little bit more difficult for him to move

10:52:41  17  quite as freely as he had previously?

10:52:43  18  A.   Yes.  He would always talk about he couldn't be doing things

10:52:48  19  late at night, or anything else, because he had to be back

10:52:50  20  because of the monitor.  He talked a lot about the monitor

10:52:53  21  restrictions.

10:52:54  22  Q.   Now, in addition to the restrictions of the monitor, was Mr.

10:53:01  23  Hosea, in addition to the law enforcement attention, having any

10:53:04  24  difficulties because of people's impressions of him now, as far

10:53:09  25  as wanting to deal with him?

10:53:11  1   A.   Yes.  It was the same thing.  Everybody knew that he had

10:53:15  2   been arrested for a serious offense, yet, he was out on the

10:53:21  3   street again.  So to the streets that means he's cooperating,

10:53:23  4   even though that wasn't the case.

10:53:25  5   Q.   How about his reputation for either ripping people off or

10:53:29  6   violence?

10:53:31  7   A.   Yes.  That was a violent incident caused by a drug debt and

10:53:36  8   absolutely increased his reputation as a violent person.

10:53:41  9   Q.   When you're intercepting calls over the wiretap, were you

10:53:45  10  intercepting anywhere you were finding Mr. Hosea was having

10:53:48  11  difficulty dealing directly with some people and had to use

10:53:50  12  intermediaries?

10:53:52  13  A.   Yes.  There were a number of times when --

10:53:54  14          THE COURT:  Let's stay on tune.  The song we're now

10:53:59  15  singing is what he actually did, not reasons why he didn't

10:54:04  16  actually --

10:54:07  17  Q.   (BY MR. COTTINGHAM) Well, did it explain to you why during

10:54:09  18  the wiretap, the amount that you were now intercepting as far as

10:54:13  19  the quantities that Mr. Hosea was dealing would be down from what

10:54:17  20  they had been previously?

10:54:19  21  A.   It was pretty apparent that not only was there a bit of a

10:54:23  22  drought as far as cocaine, but yes, his reputation for ripping

10:54:26  23  people off was keeping him from getting a solid supply.

10:54:35  24  Q.   Now, even during this period of the biggest problem for Mr.

10:54:41  25  Hosea, I believe you testified that we're still dealing with

| | | |
|---|---|---|
| 10:54:46 | 1 | approximately at least a kilo a week, even during this more |
| 10:54:50 | 2 | difficult period with Mr. Hosea, even that's intercepted over the |
| 10:54:55 | 3 | wiretap? |
| 10:54:55 | 4 | A.   Yes. |
| 10:54:55 | 5 | Q.   And Mr. Hosea, were you intercepting all the phones he had? |
| 10:54:59 | 6 | A.   No.  He had another phone. |
| 10:55:02 | 7 | Q.   Okay. |
| 10:55:02 | 8 | A.   We were intercepting two and he had another. |
| 10:55:05 | 9 | Q.   So you don't even know what other conversations you're not |
| 10:55:08 | 10 | even intercepting at this point? |
| 10:55:09 | 11 | A.   Right. |
| 10:55:11 | 12 | Q.   Going to the assets question, I know Mr. Blackerby asked you |
| 10:55:16 | 13 | about $7 million having passed through Mr. Hosea's hands over -- |
| 10:55:23 | 14 | I guess it would be a four-year period of time. |
| 10:55:26 | 15 | Now, does Mr. Hosea get to keep the entire price that |
| 10:55:30 | 16 | he earns off of a kilo? |
| 10:55:32 | 17 | A.   That he earns, yes, but not what he pays for it. |
| 10:55:36 | 18 | Q.   In other words, if he sells a kilo for $17,000, does he just |
| 10:55:41 | 19 | get to pocket the $17,000, or does he have to use that to |
| 10:55:45 | 20 | purchase more cocaine? |
| 10:55:46 | 21 | A.   He has to use it to purchase the next round. |
| 10:55:49 | 22 | THE COURT:  Counsel, no matter what you've heard on the |
| 10:55:52 | 23 | street, I'm not in kindergarten. |
| 10:55:54 | 24 | MS. COTTINGHAM:  I apologize, your Honor. |
| 10:55:56 | 25 | Q.   (BY MR. COTTINGHAM) So the $7 million would not be his |

| | | |
|---|---|---|
| 10:55:58 | 1 | profit? |
| 10:55:59 | 2 | A.    Correct. |
| 10:56:05 | 3 | Q.    For four years, do you know, other than Mr. Blackerby |
| 10:56:13 | 4 | mentioning the occasional sale of cars, any legitimate employment |
| 10:56:15 | 5 | that Mr. Hosea had? |
| 10:56:17 | 6 | A.    The review of Texas employment records, he has no wage |
| 10:56:21 | 7 | history of any sort, nor from the past few years, nor do many |
| 10:56:28 | 8 | people in his family. |
| 10:56:30 | 9 | Q.    Based on what you saw of his lifestyle and trips to |
| 10:56:36 | 10 | Louisiana, et cetera, would it have taken substantial amount of |
| 10:56:40 | 11 | money just to -- not even his assets, not counting his assets |
| 10:56:44 | 12 | yet, to just sustain that lifestyle, each of those four years? |
| 10:56:48 | 13 | A.    Yes.  Paying rent and utilities and living expenses, ate out |
| 10:56:54 | 14 | a lot, treated a lot of people, including his family and friends |
| 10:56:57 | 15 | to many, many meals.  Operating two households plus a wife, |
| 10:57:08 | 16 | girlfriend and then, the immediate family, all were supported. |
| 10:57:14 | 17 | Q.    And the trips to Louisiana, how was that supported? |
| 10:57:21 | 18 | A.    Well, the trips to Louisiana were the same thing there.  He |
| 10:57:27 | 19 | would stay in hotels, have people that went with him stay in |
| 10:57:31 | 20 | hotels, buy clothes, not take clothes, just buy what he needed as |
| 10:57:36 | 21 | he went. |
| 10:57:36 | 22 | Q.    And who would pay for the hotels? |
| 10:57:38 | 23 | A.    Duane. |
| 10:57:41 | 24 | Q.    So in addition to maintaining the households, he also had to |
| 10:57:44 | 25 | pay for all the expenses connected with these trips? |

10:57:47  1    A.    Yes.

10:57:48  2    Q.    Now, in addition to his living expenses, I believe you

10:57:52  3    testified that you've seized quite a bit of assets on the times

10:57:56  4    that you have gone in.

10:57:58  5          Would you explain how much money we come up with on

10:58:00  6    that?

10:58:03  7    A.    Yes.  In all, there were eight days during this conspiracy

10:58:07  8    that we seized cash, jewelry, or cocaine from either Mr. Hosea or

10:58:13  9    somebody immediately associated with him.  And during those eight

10:58:16  10   days, we seized a total of about 160,000 worth of cash, cars and

10:58:27  11   jewelry, and about 3.3 kilograms of cocaine and 165 grams of

10:58:35  12   crack.  So just in those eight days of the 1,400 or more days in

10:58:40  13   the conspiracy, we seized that amount.

10:58:45  14   Q.    So you'd have to factor in the value of the cocaine that he

10:58:48  15   had to pay to get that cocaine that you seized?

10:58:51  16   A.    Well, even assuming a large profit of, say, 3,000 per kilo,

10:58:56  17   the $160,000 -- and I wrote down my math this time -- was about

10:59:02  18   53 grams -- or 53 kilograms of cocaine, assuming that, you know,

10:59:07  19   that cash, cars, and jewelry were profit and not working capital.

10:59:14  20   Q.    And then, the kilos of cocaine if he -- you said 3.3 kilos,

10:59:20  21   the amount he would have had to spend to purchase those kilos is

10:59:23  22   now lost.  He doesn't even get to profit off of it.  He loses

10:59:26  23   even his investment in it?

10:59:27  24   A.    Yes.

10:59:27  25   Q.    Was he also telling people about attorney's expenses that he

10:59:33  1   had paid as far as money that would have been expended by him in

10:59:36  2   connection with this?

10:59:38  3   A.   Yes.  He talked about paying attorney's fees for a number of

10:59:44  4   people.

10:59:46  5   Q.   Did he mention a specific amount that he had had to pay just

10:59:50  6   out of his money that would have obviously been drug proceeds to

10:59:54  7   hire on his aggravated assault case?

10:59:58  8   A.   I believe on that one, he said 70,000.

11:00:02  9   Q.   In addition to that, has he made statements to people about

11:00:06  10  socking people -- socking money away, I apologize, not socking

11:00:09  11  people, but socking money away in a different location?

11:00:12  12  A.   Yes.

11:00:13  13  Q.   And would you explain that?

11:00:17  14  A.   He talked about keeping what he would call stacks at other

11:00:22  15  locations other than where he would be living.

11:00:27  16  Q.   Is this money that you seized?

11:00:30  17  A.   No.

11:00:31  18  Q.   Okay.  So you don't know what other money is out there as

11:00:36  19  far as his assets for the drug dealing?

11:00:37  20  A.   No.

11:00:40  21  Q.   I'll pass the witness, your Honor.

11:00:43  22          THE COURT:  Mr. Blackerby.

11:00:44  23                     RE-DIRECT EXAMINATION

11:00:45  24  BY MR. BLACKERBY:

11:00:45  25  Q.   Your Honor, just a few followup.

11:00:47   1          You mentioned that -- I'll just start with the

11:00:54   2   attorney's fees issue because that's near and dear to my heart.

11:00:57   3   $70,000.  Are you sure he didn't say $7,000?

11:00:59   4   A.   No.  It was 70.  He could have been puffing in that

11:01:03   5   circumstance.

11:01:04   6   Q.   Right.  In fact, puffing, it's possible for him to have been

11:01:08   7   puffing in various circumstances.  Would you agree with that?

11:01:10   8   A.   Yes.

11:01:11   9   Q.   For example, let's go to the conversation that you talked

11:01:14   10  about earlier where the one conversation that you had on the

11:01:17   11  wiretap that talked about this $160,000 deal and how he lost this

11:01:21   12  60 to $70,000 customer, right?

11:01:22   13  A.   Yes.

11:01:23   14  Q.   He made that statement to Mr. Fennell, right?  Or who was it

11:01:27   15  that he made it to?

11:01:28   16  A.   I would have to review the call.  I don't remember who he

11:01:31   17  was talking to.

11:01:32   18  Q.   It was somebody who was allegedly kind of outside this

11:01:34   19  conspiracy.  Would you agree with that?

11:01:35   20  A.   I would -- I don't remember who he was talking to but it --

11:01:40   21  when we heard it, it lined up.  We said that's exactly what we

11:01:44   22  had heard, as far as corroboration from the initial debriefers.

11:01:48   23  Q.   From the other people who were cooperating, right?

11:01:50   24  A.   Yes.  From the early-on cooperators and that that was just

11:01:55   25  exact corroboration.

11:01:57  1    Q.   It also showed that he was potentially talking to people

11:02:01  2    outside of this conspiracy and telling them information.  Would

11:02:03  3    you agree with that?

11:02:03  4    A.   I would have to review who he's talking to in that case.  He

11:02:06  5    talked to a relative in Dallas quite a bit.

11:02:08  6    Q.   Assume with me he's talking to Mr. Fennell.  If he's talking

11:02:13  7    to Mr. Fennell, Mr. Fennell would be outside this conspiracy,

11:02:15  8    right?

11:02:21  9    A.   I think they were charged as separate conspiracies.  Yes.

11:02:24  10   Q.   Okay.  And to the extent that he's puffing and telling

11:02:28  11   somebody else, that could indicate that that's part of how Mr.

11:02:31  12   Hosea presented himself.  He lied to puff up and act like he was

11:02:35  13   bigger than he actually was.  Wouldn't you agree that would be

11:02:38  14   one potential explanation?

11:02:39  15   A.   Not in that case.  But yes, I have -- there are, I'm sure,

11:02:44  16   examples where he's puffed a little bit to make himself look

11:02:47  17   bigger.

11:02:47  18   Q.   You never had any wiretap interception where there was any

11:02:50  19   kind of $70,000, you know, transaction going on you capture on

11:02:55  20   the wiretap.  You just heard this reference that, oh, boy, that

11:02:57  21   he had this $70,000-a-week customer, but you never was able to

11:03:01  22   capture any of those kinds of transactions on the wiretap?

11:03:03  23   A.   Well, because they had ripped him off for that 160,000, that

11:03:07  24   customer.  Plus that customer won a lot of money in Louisiana.

11:03:11  25   Q.   You never captured that transaction on wiretap, true?

| | | |
|---|---|---|
| 11:03:14 | 1 | A.   Oh, true. |
| 11:03:14 | 2 | Q.   Okay.  By the way, I meant to ask you this before.  You |
| 11:03:21 | 3 | mentioned other people.  There was other people in this |
| 11:03:23 | 4 | conspiracy, like his brother Michael and some other folks, true? |
| 11:03:27 | 5 | A.   Yes. |
| 11:03:27 | 6 | Q.   And you would agree with me that sometimes they worked with |
| 11:03:32 | 7 | Duane, but also, sometimes they had their own people they bought |
| 11:03:34 | 8 | for and distributed on their own.  Would you agree with that? |
| 11:03:36 | 9 | A.   I think they had their own people they distributed to.  I |
| 11:03:39 | 10 | think he was the primary source. |
| 11:03:41 | 11 | Q.   Was there any -- there was evidence that somebody indicated |
| 11:03:43 | 12 | that they had their own suppliers and they had their own thing |
| 11:03:46 | 13 | going on sometimes.  Would you dispute that? |
| 11:03:49 | 14 | A.   It depends on what you're talking about.  I mean Warrior |
| 11:03:52 | 15 | Fennell had other suppliers, Tony Brown, Levi. |
| 11:03:56 | 16 | Q.   Okay.  Certainly these three conspiracies we've heard about, |
| 11:03:59 | 17 | in fact, I think when you went to Mr. Fennell's conspiracy, you |
| 11:04:03 | 18 | didn't -- in terms of the amount of drugs that were attributable |
| 11:04:06 | 19 | to him, none of them came from Mr. Hosea.  Would that be true? |
| 11:04:09 | 20 | A.   Yes. |
| 11:04:13 | 21 | Q.   Okay.  And the reason why I ask that, as the Court has heard |
| 11:04:16 | 22 | a lot of evidence about these three conspiracies with lots of |
| 11:04:19 | 23 | drugs.  There is three separate charged conspiracies and to the |
| 11:04:22 | 24 | extent that there's -- we needed to concentrate on Mr. Hosea, as |
| 11:04:26 | 25 | opposed to what Mr. Fennell did and what Mr. Rodriguez, right? |

| | | |
|---|---|---|
| 11:04:32 | 1 | A.   Yes. |
| 11:04:33 | 2 | Q.   Almost done. |
| 11:04:35 | 3 |      You mentioned the pistol-whipping incident; is that |
| 11:04:40 | 4 | right? |
| 11:04:40 | 5 | A.   Yes. |
| 11:04:40 | 6 | Q.   Now, as I understand it, that was -- there was an incident |
| 11:04:43 | 7 | involving Mr. Marcus Dupree and Mr. Hosea and somebody else; is |
| 11:04:48 | 8 | that right? |
| 11:04:48 | 9 | A.   The victim. |
| 11:04:50 | 10 | Q.   Yes.  And the victim, I believe there's some differing |
| 11:04:54 | 11 | evidence, I guess, in this case about who was involved in the |
| 11:04:58 | 12 | assault and what actually happened.  Would you agree with that? |
| 11:05:03 | 13 | A.   It depends on what capacity -- no.  It's pretty clear who |
| 11:05:09 | 14 | was involved. |
| 11:05:10 | 15 | Q.   All right.  Well, let me ask you:  There were roles in the |
| 11:05:12 | 16 | incident and who did what?  There was some differing accounts of |
| 11:05:16 | 17 | that.  Would you agree with me? |
| 11:05:17 | 18 | A.   Yes. |
| 11:05:17 | 19 | Q.   There's evidence that Marcus Dupree was the person who |
| 11:05:20 | 20 | assaulted the victim, not Duane Hosea.  Would you agree with |
| 11:05:22 | 21 | that? |
| 11:05:23 | 22 | A.   I wouldn't say not, but I would say they were both involved. |
| 11:05:28 | 23 | Q.   Would you agree that there was at least some evidence that |
| 11:05:31 | 24 | Marcus Dupree -- and not making a conclusion about what you |
| 11:05:34 | 25 | think, but there was some evidence that it was Marcus Dupree, and |

| | | |
|---|---|---|
| 11:05:37 | 1 | not Mr. Hosea, who was involved in the assault.  Would you agree |
| 11:05:39 | 2 | with that? |
| 11:05:43 | 3 | A.   No.  I think it was both of them.  If you're talking about |
| 11:05:47 | 4 | who put a fist here or there, yes, there's been conflicting |
| 11:05:55 | 5 | stories. |
| 11:05:55 | 6 | Q.   In terms of their -- let me make sure I'm clear. |
| 11:05:58 | 7 | If somebody in terms of who's throwing the punches or |
| 11:06:01 | 8 | who's throwing the -- making the blows, there's conflicting |
| 11:06:03 | 9 | evidence about who actually did that.  Would you agree with that? |
| 11:06:07 | 10 | A.   Yes, given what all those involved say. |
| 11:06:10 | 11 | Q.   What the victim says, you've got what Mr. Dupree says and |
| 11:06:13 | 12 | what Mr. Hosea says? |
| 11:06:15 | 13 | A.   Yes.  I would agree. |
| 11:06:16 | 14 | Q.   So we have, like, a kind of a he-said-she-said situation in |
| 11:06:19 | 15 | terms of the accounts of that, there was an incident? |
| 11:06:23 | 16 | THE COURT:  Well, this incident doesn't have anything |
| 11:06:24 | 17 | to do with sentencing.  It may or may not be litigated in the |
| 11:06:28 | 18 | state courts. |
| 11:06:30 | 19 | MR. BLACKERBY:  And, your Honor, the only reason I'm |
| 11:06:32 | 20 | bringing it up right now -- |
| 11:06:33 | 21 | THE COURT:  It was brought up on direct.  The Court |
| 11:06:35 | 22 | paid absolutely no attention to it. |
| 11:06:37 | 23 | MR. BLACKERBY:  I understood, your Honor. |
| 11:06:38 | 24 | The reason why I'm bringing it up is I believe they're |
| 11:06:40 | 25 | going to state that is a brandishing of a weapon, which means he |

11:06:44  1    should get an extra two years under the gun count.  So I wanted

11:06:47  2    to try to address that.

11:06:48  3              THE COURT:  The Court withdraws its comment.  That is

11:06:51  4    exactly what I anticipate you're going to say.

11:06:53  5              MR. BLACKERBY:  Okay.

11:06:54  6    Q.   (BY MR. BLACKERBY) So in terms of if the Court is trying to

11:06:56  7    evaluate what happened, there's conflicting evidence about what

11:06:59  8    role and what actually happened in that account.  Would you agree

11:07:02  9    with me?  And what Mr. Hosea's role in that was.  Would you

11:07:05 10    agree?

11:07:05 11    A.   Yes.

11:07:05 12    Q.   All right.  And finally, this $50,000 that you seized on

11:07:22 13    this one occasion, was there any drugs in the vehicle?

11:07:26 14    A.   Just a pistol.  Yes.  Marihuana but not any substantial

11:07:31 15    cocaine.

11:07:32 16    Q.   Was there -- were you able to tie those funds to any

11:07:37 17    specific transaction?

11:07:39 18    A.   No.

11:07:40 19    Q.   It was just the fact that it was a large amount of cash?

11:07:46 20    A.   Yes.

11:07:46 21    Q.   All right.  And in terms of he -- we've talked about the

11:07:51 22    fact that he sold vehicles, a lot of times, for cash, true?  Let

11:07:59 23    me rephrase my question.

11:08:00 24    A.   There's so many cars that I, you know, need more specifics

11:08:03 25    on the cash or not.  But yes, cash was definitely the way to go.

11:08:07   1   Q.   And in terms of whether or not he sold the vehicle and some

11:08:10   2   of that money that you're referring to in that 50,000 seizure

11:08:13   3   could have come from the sale of a vehicle.  You just don't have

11:08:15   4   any evidence, one way or the other, do you?

11:08:17   5   A.   Yes.  The way it was packaged, the way it was in the car, it

11:08:22   6   was strewn about in big amounts, small amounts.  It wasn't one

11:08:25   7   nice, organized chunk of 50,000.  It was, in my opinion and

11:08:32   8   belief, drug proceeds.

11:08:33   9   Q.   Let me ask it to you this way:  Did the way it was packaged,

11:08:37  10   did it indicate that it all came from one transaction?

11:08:41  11   A.   No.  It could have been multiple transactions.

11:08:43  12   Q.   So some of it could have been from a drug transaction, some

11:08:46  13   of it could have been from a vehicle transaction.  Would you

11:08:48  14   agree with that?

11:08:49  15   A.   I wouldn't agree because at the time we were watching him,

11:08:53  16   we didn't see him doing car business like that, at least not with

11:08:58  17   other people.  If he's doing something on the internet, I

11:09:00  18   wouldn't know.

11:09:00  19   Q.   So the only evidence you have that that was drug money was

11:09:03  20   the fact it's a large amount of cash and the way it was packaged.

11:09:07  21   Would you agree with that?

11:09:07  22   A.   Yes.  And the fact that the cars had been seized and

11:09:13  23   forfeited.

11:09:13  24   Q.   Okay.  One more thing.

11:09:22  25        There was that one transaction you talked about how Mr.

| | | |
|---|---|---|
| 11:09:24 | 1 | Hosea was selling fake cocaine; is that right? |
| 11:09:31 | 2 | A.   At times, he sold fake crack.  Yes. |
| 11:09:33 | 3 | Q.   And did he ever sell -- there was this $160,000 transaction |
| 11:09:37 | 4 | where he sold somebody fake stuff; is that true? |
| 11:09:40 | 5 | A.   Yes. |
| 11:09:41 | 6 | Q.   Okay.  And you were able to determine that there was a |
| 11:09:44 | 7 | period of time where he was selling fake stuff and that in terms |
| 11:09:47 | 8 | of -- to the extent it was fake, that shouldn't be counted |
| 11:09:50 | 9 | towards the weight.  Would you agree with that? |
| 11:09:52 | 10 | A.   No.  We're not counting that transaction.  That was a fake. |
| 11:09:57 | 11 | He ripped him off. |
| 11:09:59 | 12 | Q.   Thank you, your Honor.  Pass the witness. |
| 11:10:01 | 13 | THE COURT:  The dummy cocaine, as I understood, could |
| 11:10:07 | 14 | be fake but, also, from the wiretaps diluted so much it couldn't |
| 11:10:13 | 15 | be made into crack cocaine, which is one of the criticisms of Mr. |
| 11:10:18 | 16 | Hosea's suppliers; is that correct? |
| 11:10:19 | 17 | THE WITNESS:  That's correct.  And the incident that |
| 11:10:21 | 18 | he's talking about here, that was all fake.  They had such -- |
| 11:10:28 | 19 | THE COURT:  I understand that.  But I just remember on |
| 11:10:30 | 20 | the wiretaps those criticism that he diluted it to some degree |
| 11:10:33 | 21 | that they can't make crack out of it. |
| 11:10:36 | 22 | THE WITNESS:  Yes.  The poorer the quality, the worse |
| 11:10:39 | 23 | it puts the crack -- |
| 11:10:40 | 24 | THE COURT:  So when you say dummy or fake, there was |
| 11:10:43 | 25 | some diluted cocaine and there was some non-cocaine at all. |

11:10:49   1              THE WITNESS:  Yes.

11:10:49   2              THE COURT:  Okay.

11:10:50   3   Q.  (BY MR. BLACKERBY) And so, to be clear, I think the Court is

11:10:53   4   clear.  There is some situations where he sold something and

11:10:56   5   then, had a little bit, some situations where it was completely

11:10:58   6   fake and there was none in there.  Would you agree with that?

11:11:02   7   A.   Yes.  The crack he had was completely fake.  In that case, I

11:11:05   8   would say that was completely fake.

11:11:07   9   Q.   Okay.  No question, your Honor.

11:11:09  10              THE COURT:  Ms. Cottingham, any further questions?

11:11:11  11              MS. COTTINGHAM:  I do, your Honor.

11:11:12  12                    RE-CROSS EXAMINATION

11:11:12  13   BY MS. COTTINGHAM:

11:11:15  14   Q.   The defense attorney asked you about the brandishing of a

11:11:17  15   firearm in his last questions, and I'd like to go into that

11:11:21  16   incident a little bit.

11:11:22  17          He suggested that there was conflicting evidence

11:11:25  18   because Mr. Hosea's account was different than some of the

11:11:27  19   others.  Did you have a chance to talk to the victim of this

11:11:30  20   offense?

11:11:31  21   A.   I did.

11:11:31  22   Q.   Would you explain the circumstances of talking to the victim

11:11:34  23   of this offense?

11:11:35  24   A.   Well, the victim was asked to come up there by a relative of

11:11:41  25   his to look at some rims that were being put on his car.

```
11:11:48    1    Q.    How do you know this?  Where were you?  What were the

11:11:51    2    circumstances of talking to the victim?

11:11:53    3    A.    Oh, the victim came into the police department to be

11:11:59    4    interviewed and talk about this event.  He was badly beaten.

11:12:04    5    Q.    Did you physically observe the badly beaten on the victim?

11:12:09    6    A.    I did.

11:12:09    7    Q.    What did you observe?

11:12:11    8    A.    He went through his injuries, he had broken orbital, bones

11:12:16    9    and all kinds of injuries.  He had lost a tooth.

11:12:18   10         THE COURT:  It's clear from the evidence I've seen and

11:12:20   11    heard that the injuries were not made with a fist.

11:12:26   12    Q.    (BY MR. COTTINGHAM) So he told you what happened, who hit

11:12:29   13    him, what happened, what were the circumstances, as far as

11:12:32   14    whether there's a brandishing of this firearm or not?

11:12:34   15    A.    He said that both of them hit him but that Mr. Hosea hit him

11:12:39   16    with the pistol and stuck it in his mouth and threatened him at

11:12:43   17    the end.

11:12:44   18    Q.    Now, did he even know who the second individual was?

11:12:47   19    A.    Not at that time.

11:12:48   20    Q.    So at that point he couldn't even tell who this second

11:12:52   21    person was with Mr. Hosea?

11:12:53   22    A.    Right.

11:12:54   23    Q.    But he knew Mr. Hosea?

11:12:56   24    A.    Yes.

11:12:56   25    Q.    And he was a able to identify what his actions were there at
```

| | | |
|---|---|---|
| 11:12:59 | 1 | the scene? |
| 11:13:00 | 2 | A.    Yes. |
| 11:13:00 | 3 | Q.    Now, in addition to whether the evidence is consistent with |
| 11:13:03 | 4 | the victim's account or not, was the firearm that was utilized in |
| 11:13:09 | 5 | that assault recovered? |
| 11:13:11 | 6 | A.    Yes. |
| 11:13:12 | 7 | Q.    Would you explain that? |
| 11:13:15 | 8 | A.    In the case following the assault, a search warrant was |
| 11:13:17 | 9 | conducted at his house. |
| 11:13:18 | 10 | Q.    At whose house? |
| 11:13:19 | 11 | A.    At Hosea's house and in the driveway was the van that he was |
| 11:13:26 | 12 | said to have been using that day, which we already knew from |
| 11:13:28 | 13 | surveillance.  We knew the van.  And in the van was a pistol, and |
| 11:13:32 | 14 | on the pistol was blood and -- well, blood and skin, obviously |
| 11:13:42 | 15 | that was subsequently tested. |
| 11:13:44 | 16 | Q.    And that gun was tested and was the victim's DNA on that |
| 11:13:48 | 17 | gun? |
| 11:13:49 | 18 | A.    Victim's DNA was on the end of the barrel.  Yes. |
| 11:13:53 | 19 | Q.    And how about Mr. Hosea's?  Was it on there with the -- |
| 11:13:57 | 20 | A.    His was on the pistol grip and on the side release, yes. |
| 11:14:01 | 21 | Q.    So the physical evidence also supported the account given by |
| 11:14:08 | 22 | the victim? |
| 11:14:08 | 23 | A.    Yes. |
| 11:14:19 | 24 | Q.    And just to make it clear, I think the Court already cleared |
| 11:14:22 | 25 | this up, but the crack cocaine you're saying was the stuff that |

| | | |
|---|---|---|
| 11:14:25 | 1 | might be fully fake, but on the dummy cocaine that was powder |
| 11:14:29 | 2 | cocaine, what was the situation with that powder cocaine? |
| 11:14:32 | 3 | A.   It had a small amount of true cocaine in it, but when Mr. |
| 11:14:38 | 4 | Hosea would get it, he would also sprinkle things on it to |
| 11:14:44 | 5 | increase the stench or the smell of cocaine so the buyer would |
| 11:14:47 | 6 | know that it -- or believe that it was good quality. |
| 11:14:53 | 7 | Q.   Pass the witness. |
| 11:14:55 | 8 |             THE COURT:  Mr. Blackerby. |
| 11:14:57 | 9 |             MR. BLACKERBY:  Nothing further. |
| 11:14:58 | 10 |             THE COURT:  You may step down. |
| 11:15:10 | 11 |             The objection with regard to the offense level |
| 11:15:12 | 12 | calculation is overruled.  The evidence is overwhelming, much |
| 11:15:16 | 13 | less by a preponderance of the evidence, that Mr. Hosea's |
| 11:15:20 | 14 | responsible for his own personal conduct far in excess of 150 |
| 11:15:25 | 15 | kilos of cocaine.  One-hundred-fifty kilos of cocaine would |
| 11:15:30 | 16 | establish the original offense level. |
| 11:15:37 | 17 |             And I think I've already entered an order on this, but |
| 11:15:40 | 18 | of course, the testimony of the law enforcement officers before |
| 11:15:44 | 19 | all of the defendants present in the courtroom is incorporated |
| 11:15:48 | 20 | into this hearing as well as, of course, the presentence |
| 11:15:53 | 21 | investigation. |
| 11:15:55 | 22 |             Mr. Blackerby, do you know of any legal reason we |
| 11:15:57 | 23 | shouldn't proceed with sentencing? |
| 11:15:58 | 24 |             MR. BLACKERBY:  I do not, your Honor. |
| 11:15:59 | 25 |             THE COURT:  The government have any reason not to |

| | | |
|---|---|---|
| 11:16:00 | 1 | proceed? |
| 11:16:01 | 2 | MS. COTTINGHAM:  We do not, your Honor. |
| 11:16:03 | 3 | THE COURT:  Mr. Hosea, you've been more than patient -- |
| 11:16:06 | 4 | if you'll come forward, please -- sitting here listening.  Now |
| 11:16:12 | 5 | it's your opportunity to say anything that you would like.  You |
| 11:16:15 | 6 | aren't required to say it, but you have the right to say it.  I |
| 11:16:18 | 7 | encourage you to say whatever you'd like to say. |
| 11:16:21 | 8 | THE DEFENDANT:  I would like -- I would, first, like to |
| 11:16:47 | 9 | apologize to you and the community of Austin, as well as the |
| 11:16:51 | 10 | people that were affected directly for my bad decisions in |
| 11:16:54 | 11 | selling drugs.  Mr. Sparks, I know I've been incarcerated for |
| 11:16:59 | 12 | only seven months, and I still have a long sentence to live, but |
| 11:17:34 | 13 | the lesson is already learned.  Your Honor, I did some bad things |
| 11:17:49 | 14 | in selling drugs and I'm really sorry.  I know you don't really |
| 11:17:53 | 15 | have a chance to get to know me, know me and my real character, |
| 11:18:14 | 16 | but I stand here before you today to say a lot of things about me |
| 11:18:19 | 17 | aren't true. |
| 11:18:26 | 18 | Your Honor, I did a lot of good things the vast |
| 11:18:28 | 19 | majority of my life.  It was really hard to stay focused, but I |
| 11:18:39 | 20 | did grow up in a neighborhood that was rough and everybody sold |
| 11:18:44 | 21 | drugs and used them.  I participated in sports all of my life and |
| 11:18:51 | 22 | great student as well as a great athlete.  I was All American in |
| 11:18:59 | 23 | high school and went to Oklahoma State on an athletic scholarship |
| 11:19:08 | 24 | in 1997.  I stayed active in college football until the year |
| 11:19:17 | 25 | 2004. |

```
11:19:19   1        My mother has always had health problems ever since my
11:19:22   2   sister was killed when I was ten years old.  That was hard for me
11:19:31   3   to deal with, but I was still determined to make it.  My mother's
11:19:48   4   health got really bad.  In '99, one incident she was rushed to
11:19:59   5   the hospital, had to bring her back to life.  This caused my
11:20:03   6   grades to slip.  In '99, my coach at Oklahoma State sent me to
11:20:07   7   junior college in California.  Stayed in junior college until
11:20:12   8   2001 and received another scholarship at Baptist University.
11:20:16   9   Stayed there from 2001, 2002 sitting out one season.  I returned
11:20:20  10   to play in 2004 season.
11:20:21  11        I really tried hard, Mr. Sparks, always doing positive
11:20:26  12   things.  In the summers, I would coach with my high school
11:20:30  13   coaches while I was attending college.  I also coached some track
11:20:34  14   in 2004, 5 and 6, every summer and sponsored kids that couldn't
11:20:39  15   afford their track fees.  Nobody paid me to coach.  I did this
11:20:43  16   because this is the type of person that I am, Mr. Sparks.  I made
11:20:47  17   a very bad choice of getting involved in drugs.
11:20:52  18        Your Honor, please don't take my life away from me for
11:20:54  19   one mistake.  I have three beautiful kids that I really are
11:21:01  20   raising to be somebody.  My beautiful wife who needs me.  My
11:21:11  21   mother needs me.  I was the only one there for her to buy her
11:21:33  22   medicine and try to make her feel like everything was going to be
11:21:38  23   okay, even after being diagnosed with a brain tumor and diabetes.
11:21:54  24   Mr. Sparks, don't let one bad decision erase several good things
11:21:59  25   that I have done.  My mother doesn't have anyone else there to
```

11:22:05  1  help her.

11:22:08  2          Your Honor, I didn't just sell drugs the whole time.  I

11:22:10  3  had a business that I had opened up, Dynamic Sports.  I also sold

11:22:16  4  cars.  This is not made up.  Mr. Judge Sparks, I was really

11:22:21  5  trying.  I never liked drugs, what drugs did to families, because

11:22:27  6  I know what it did to mine growing up.  Your Honor, no matter

11:22:31  7  what other people say in this conspiracy can save their own self,

11:22:35  8  I'm truly a good person that made a very bad choice for getting

11:22:38  9  involved with drugs.  Mr. Judge Sparks, I stand before you here

11:22:43  10  today hoping and praying that you could find it in your heart to

11:22:45  11  give me one more chance as most of any codefendants have had many

11:22:48  12  and received much less time that was been offered to me.

11:22:54  13          I really feel that the punishment is excessive,

11:22:58  14  considering all the positive things I have done.  And I really

11:22:59  15  hope that you could see it.  To my mother, I love her.  Love you

11:23:16  16  and I hope you hold up till I come home.  And my wife, I love

11:23:26  17  you, and I hope you could take care of my kids while I'm gone.

11:23:38  18  That's it.

11:23:41  19          THE COURT:  Mr. Blackerby.

11:23:42  20          MR. BLACKERBY:  Thank you, your Honor.  We have

11:23:45  21  submitted some letters to the Court.

11:23:46  22          THE COURT:  Yeah.  I've got them and I've attached them

11:23:49  23  already to the presentence report.

11:23:51  24          MR. BLACKERBY:  Some of the family has provided me some

11:23:54  25  letters.  I know you're not going to have time to read them.

11:23:57  1          THE COURT:  They just gave me one when I came out from

11:24:03  2   Reverend Showels.

11:24:06  3          MR. BLACKERBY:  There's some forms that have been

11:24:07  4   signed in there by some of the officials at Bastrop County, I

11:24:11  5   believe, talking about the character.  I know there's some people

11:24:13  6   that want to speak here on his behalf.  I would say in terms of

11:24:16  7   Mr. Hosea, I would just note that he has a very limited criminal

11:24:22  8   history.  This is the first felony conviction he's ever had.  And

11:24:28  9   I know that there's been some issues with the timing of the plea.

11:24:31 10   And I -- just for the purposes of the record, I'm not sure that

11:24:33 11   the Court is aware that Mr. Hosea for a large part of the time in

11:24:37 12   which this case was developing was in the hospital, had medical

11:24:41 13   issues which, in some sense, delayed this whole --

11:24:44 14          THE COURT:  The Court is aware of his medical issues

11:24:48 15   because I've authorized not only the medical but the bills to be

11:24:53 16   paid.

11:25:04 17          Government have anything else they wish to say?

11:25:08 18          MS. COTTINGHAM:  Briefly, your Honor, on Mr. Hosea, I

11:25:14 19   think the government has a different view of Mr. Hosea than he

11:25:17 20   does of himself.  Where he is today is the result not of just one

11:25:24 21   bad decision, it's the result of a lot of bad decisions over a

11:25:30 22   long period of time, in 2005, in 2006, in 2007, in 2008.  It

11:25:39 23   encompasses decisions on, you know, hundreds of different times

11:25:44 24   to be delivering large quantities of drugs.  It involves

11:25:49 25   decisions on hundreds of times to be around with a firearm.  It

11:25:55  1  involves decisions more recently to pop drug customers, that is,

11:26:00  2  to sell them dummy, low quality cocaine at -- while demanding

11:26:08  3  pull prices if he was getting cocaine.  It involves obviously the

11:26:13  4  brandishing of the firearm incident that we have mentioned.

11:26:17  5       This has been a long, painstaking investigation.  Mr.

11:26:21  6  Hosea's a very intelligent man, and he has been good about having

11:26:26  7  other people in roles where they transported dope, such as Mr.

11:26:30  8  Showels who was stopped with the two kilos of cocaine.  And so,

11:26:36  9  it has been hard to get to the point where we are today.

11:26:43  10      The guidelines are high in this case, but I think that

11:26:45  11 they are based on that repeated criminal conduct.  And I told Mr.

11:26:50  12 Hosea from the beginning that he would have to earn any reduction

11:26:56  13 that he received because I did not feel like the guidelines put

11:27:00  14 him in an unfair position, given the amount of decisions he made

11:27:05  15 to get into that position and the way that he treated people in

11:27:09  16 the process, because I've had the chance to personally sit down

11:27:14  17 with more than ten individuals who have been able to recount

11:27:18  18 their personal dealings with Mr. Hosea.

11:27:24  19      And as far as earning some reduction, I have filed a

11:27:28  20 sentencing memorandum with the Court in reference to what has

11:27:32  21 been done up until this point, and have tried to factor in the

11:27:39  22 fact that he did also plead guilty in this case with that

11:27:44  23 because, frankly, had we gone to trial in this case, based on Mr.

11:27:47  24 Hosea's record of treatment, the level of drug dealing, the

11:27:50  25 violence, we would have been going for a life sentence, and we

11:27:54   1   would have felt like it was appropriate based on the conduct that

11:27:56   2   he had committed at that time.

11:27:58   3          However, he did plead guilty, he did take steps and

11:28:02   4   I've outlined those in the motion and would rely on that motion,

11:28:05   5   your Honor.

11:28:08   6          THE COURT:  Probation want to make a statement for the

11:28:09   7   record?

11:28:10   8          PROBATION OFFICER:  No, sir.

11:28:11   9          THE COURT:  Anybody wish to speak at this sentencing,

11:28:13  10   if you'd follow the security officer.

11:28:31  11          SPEAKER:  Hello, your Honor.

11:28:32  12          THE COURT:  Yes, ma'am.

11:28:33  13          SPEAKER:  I'm Duane Hosea's mother.  I just want to

11:28:39  14   demonstrate to my son that I love him and that throughout his

11:28:43  15   childhood, I would work seven days a week, twelve hours a day for

11:28:46  16   20 years at laboratories.  I was very independent person and a

11:28:50  17   single mother, you may as well say.  Duane as a child at ten

11:28:55  18   years old had to take care of his sister and brothers.  I

11:28:59  19   couldn't afford a daycare.  Duane had to come home from school,

11:29:03  20   try to cook dinner for five kids, bathe them, wash clothes, clean

11:29:09  21   up.  He had to be a father, a brother, a friend and a mediator.

11:29:14  22   It would be times that his brothers would fall.  Duane would say,

11:29:19  23   get up, don't be a punk, you can do it.  You going to be somebody

11:29:24  24   one day.  You're going to be a football player.  You're going to

11:29:26  25   make it in life.  It's just us and momma.  She have to work.

11:29:32   1        So no, I got sick five years ago with a pituitary

11:29:37   2   tumor.  I worked at Abbott Laboratory as products auditor that I

11:29:41   3   had been there for 20 years.  Had a fatal attack, they revived me

11:29:45   4   alive.  I was dead.  Since then, your Honor, I has been

11:29:49   5   hospitalized four years straight every month.  This year has been

11:29:54   6   the first year that I has not been hospitalized for my illness.

11:29:58   7   I have prayed to God for Him to make me strong for anything that

11:30:02   8   I foresee.

11:30:03   9        I worked hard to get Duane to college and Michael.  I

11:30:08  10   -- all my children, I made sure that they were going to go to

11:30:11  11   school.  That was my ambition for my children.  Not a drug

11:30:16  12   dealer, not a user, and not get involved with other people to

11:30:20  13   entice them to do wrong.  That was never my intentions.  My

11:30:25  14   parents raised 11 kids.  I have a sister that's a prosecuting

11:30:32  15   attorney, Carla Cook, DA.  All of my family comes from well-being

11:30:36  16   raised, never was it to go off and do wrong.

11:30:40  17        I have to set the record for myself, says mother, no

11:30:44  18   mother, mother was there, mother had to work, and Duane was the

11:30:48  19   oldest and he had to -- after losing his sister, Duane should

11:30:52  20   have had psychiatric help.  I credit him.  I didn't think he

11:30:57  21   needed help.  He saw the car ran over his sister's head and split

11:31:01  22   her apart at four years old.  And at that time Duane said, I will

11:31:06  23   make sure, momma, you won't lose another kid.  This won't ever

11:31:11  24   happen again in life.  For people you have to work.  You have

11:31:17  25   mediators and everybody else out there, your Honor, that is taken

11:31:21   1   away all of the children where parents have to work and don't

11:31:25   2   have a father.

11:31:27   3          And if you could take my records, you see that I don't

11:31:31   4   lie about anything.  And I love my son and I'm sorry that he got

11:31:37   5   off on the wrong track, but whomever it was that got him there

11:31:42   6   after he finished college because he had three hours to finish

11:31:45   7   from Abilene Christian.  Michael needed nine hours for clearing

11:31:50   8   Michelangelo State.  That was my job as a parent even being sick,

11:31:56   9   but I was forced to retire because of my illness, had been

11:32:00  10   intubated two to three times a year in the last four years for

11:32:05  11   being illness.  But my son is not a killer, he's not a murderer.

11:32:10  12   He is far from that.

11:32:12  13          I believe the psychiatric from being said his sister

11:32:16  14   killed and the guy getting away clean because at the time they

11:32:19  15   didn't check people for cocaine.  He was an alcohol -- he was a

11:32:22  16   cocaine but not on alcohol.  They tried him for alcohol, and he

11:32:26  17   got away free, after murdering my four-year-old daughter on

11:32:30  18   Thanksgiving day, 20-some years ago.  And Duane said, momma,

11:32:34  19   don't worry, I'm going to take care of the kids.  And I had to

11:32:38  20   keep a roof over their head.  I wasn't in the system with Section

11:32:41  21   8 and welfare and all the other good benefits that most people

11:32:44  22   get.  I worked because that's the moral of my parents taught us.

11:32:50  23   You get a job, you do the right thing and make it in life the way

11:32:54  24   -- right way.

11:32:56  25          So I want to set the record straight for me.  And when

| | |
|---|---|
| 11:32:59 | 1 |
| 11:33:03 | 2 |
| 11:33:10 | 3 |
| 11:33:13 | 4 |
| 11:33:17 | 5 |
| 11:33:20 | 6 |
| 11:33:22 | 7 |
| 11:33:26 | 8 |
| 11:33:29 | 9 |
| 11:33:32 | 10 |
| 11:33:36 | 11 |

1  they took my car, I was working and making payments on it.  That
2  little $3,500 van, I didn't have enough money because I'm already
3  on disability from being illness, to fight for my little -- one
4  little-bitty car.  So I don't think, your Honor, it's fair.  I
5  think we should take everything right.  I think he deserves a
6  second chance in life because he had to raise his sister and
7  brothers.  He has three kids that he needs to raise.  And
8  hopefully by his mistake, he can get out soon enough that he can
9  raise them, and they can go to college and maybe they could
10  become an attorney, or a lawyer, or a doctor, because I'm too ill
11  now.

12          Before, I was making enough money, $68,000, I could pay
13  it.  So I don't think it's fair.  Don't put me in the record, I
14  just really got upset about it.  I wasn't going to talk because
15  I'm very, like you say, I have a pituitary.  I get upset enough,
16  I'll be back in ICU and respiratory down my throat, but I can't
17  see the record go down where Duane and Michael was good kids.
18  They were very good kids, and they raised by me coming up through
19  school because I had to do what I had to do, and Duane had to
20  come home and cook and clean and make sure they had their
21  homework and do their stuff.  Anybody can vouch for that.
22  Coaches, it's a coach here.  I was situated every night for my
23  child in high school to make sure they wasn't going to skipping
24  school.  Worked third shift so I could be waiting all day.  So I
25  don't think it's fair.  But that's life and only God could make

11:34:35   1   that clear.  Whatever is planned for Duane, that's God's

11:34:38   2   decision.  You know what I'm saying?

11:34:40   3          But I appreciate y'all giving me the time because I

11:34:44   4   just want to set the record straight for me as a mother and a

11:34:46   5   parent and my son.  And thank you, your Honor, and the Court.

11:34:52   6          THE COURT:  Thank you for coming down, ma'am.

11:35:13   7          MR. SHOWELS:  Your Honor, members of the Court, I'm

11:35:16   8   Duane's uncle, Reverend Showels.  Just in regard to what his

11:35:25   9   mother said about him playing ball, I was the first one in my

11:35:35   10  family to go to college.  My youngest sister, she went right

11:35:38   11  after me and finished.  She's the lawyer there she spoke about.

11:35:41   12  But I didn't finish.  I went three years.  Just to say I put all

11:35:47   13  of my hope in my oldest nephew, which is Duane, made him into a

11:35:54   14  pretty good football player.  He had plenty of opportunities to

11:35:58   15  go to college on football scholarship.  We used that as a way to

11:36:04   16  pay for college education.  Thank the Lord my kids, you know,

11:36:09   17  they pretty bright, they don't have to play sports to get -- pay

11:36:14   18  for their education.

11:36:15   19         But when I was growing up, we knew we needed to be good

11:36:19   20  in athletics to get a scholarship and try to get education and

11:36:23   21  get out of the ghetto.  I bought a car from my nephew when I was

11:36:35   22  -- car lease and we went to the bank and we had a note.  I just

11:36:38   23  paid it off, I think, last year.  And I referred some of my

11:36:44   24  coworkers to him to buy some automobiles.  These kids right now,

11:36:50   25  there's no stash or money.  His kids, they sing in my choir just

11:36:54  1   about every week.  My wife is scrounging up all the clothes,

11:37:00  2   giving them to his wife for their kids.

11:37:06  3        His mom receives disability checks and retirement

11:37:10  4   checks from her illness.  Duane -- I remember Duane always

11:37:21  5   helping people.  I know he made some mistakes.  I'm not going to

11:37:26  6   sit here and say that he didn't.  He sat here and said his self

11:37:29  7   he made some mistakes.  And we all make mistakes.  As long as we

11:37:31  8   live in the flesh, till we die, we're going to make mistakes

11:37:34  9   because ain't nobody going to be perfect.

11:37:38  10       Duane has a lot of qualities in his character, in his

11:37:42  11  person, which his intellect stands out the most.  His mother may

11:37:50  12  have mentioned that it was hard on him growing up.  We came from

11:37:53  13  a pretty rough neighborhood and football's a rough sport, and all

11:37:58  14  of his uncles told him, you're going to have to be rough if

11:38:01  15  you're going to make it in this sport, if you're going to get a

11:38:03  16  college scholarship.  So we taught him to be rough and we taught

11:38:08  17  him to be tough because that's what the times were way back when.

11:38:12  18  It was tough times and only tell people they're going to make it.

11:38:16  19       I'm sorry that Duane chose to use that in a negative

11:38:24  20  way.  He said that he made mistakes.  And sometimes we make

11:38:31  21  mistakes in life, especially when the odds are stacked against

11:38:37  22  us.  When the odds are stacked against us, his mom may gave

11:38:40  23  mentioned real good about how hard it was for him to try to take

11:38:44  24  care of his family.  I remember talking with him and telling him

11:38:47  25  that I wanted him to finish college because none of us ever

| | | |
|---|---|---|
| 11:38:49 | 1 | finished.  And while he was in college, I talked with him and I |
| 11:38:54 | 2 | could tell by the conversation that it was hard on him trying to |
| 11:38:58 | 3 | decide to stay in school or come home and try to help his mother |
| 11:39:02 | 4 | with the other kids and help his mother with her sickness. |
| 11:39:08 | 5 | I know it was hard for him.  That's another reason why |
| 11:39:11 | 6 | he kept going back and forth, back and forth, because as soon as |
| 11:39:14 | 7 | we get school starts, he's very bright, never had a problem with |
| 11:39:17 | 8 | making the test scores or makes the grades, but he torn over the |
| 11:39:22 | 9 | fact should I go home and try to make money to help my mother |
| 11:39:26 | 10 | with the kids.  Try to help her put food on the table. |
| 11:39:30 | 11 | I want to say that God bless you and this court.  The |
| 11:39:33 | 12 | last time I was here, I heard the word "mercy" a lot, and it made |
| 11:39:39 | 13 | me feel good as a minister to hear you say mercy and other people |
| 11:39:43 | 14 | use that word.  And today, I just hope that the Court can show |
| 11:39:48 | 15 | true mercy on Duane and lighten his sentence as much as possible |
| 11:39:54 | 16 | because this is a good person.  If he can spend some time |
| 11:39:58 | 17 | studying and he could do whatever he want to do.  He's the type |
| 11:40:02 | 18 | of person, he can be whatever he want to be.  So if you lighten |
| 11:40:05 | 19 | his -- I'll just hope and pray that the Court can lighten his |
| 11:40:08 | 20 | sentence just a little, that way might have some time, he won't |
| 11:40:14 | 21 | be a completely old man when he get out.  He'll still have some |
| 11:40:17 | 22 | time to do something with his life and maybe even spend some time |
| 11:40:21 | 23 | with his kids.  He can still do those things if you give him |
| 11:40:27 | 24 | another chance by lightening his sentence. |
| 11:40:30 | 25 | I just want to say thank you, your Honor, and may God |

11:40:35  1  bless you and this court for allowing his family to speak on his

11:40:39  2  behalf today.

11:40:40  3          THE COURT:  You have that right.  Thank you for coming

11:40:41  4  up.

11:41:02  5          SPEAKER:  I just want to say that my dad helped support

11:41:06  6  me with so many things and that he did so many things for me.  It

11:41:16  7  was a lot that he wanted me to do in life, like going to college,

11:41:21  8  getting a good education.  And that I just want to let him know

11:41:28  9  that I love him and I'm there to support him when he gets out.

11:41:33 10  And things won't be the same without him.  Just want to ask if

11:41:42 11  you could give him a less time so when he gets out, we can all be

11:41:46 12  together and be better than he was.  I just want to say if I

11:41:50 13  could get my dad a hug, one last time, before he leaves.

11:41:58 14          THE COURT:  I'd like to do that, but I can't do that

11:42:00 15  right now.  But I do want to thank you for coming up here and

11:42:05 16  supporting your father because it's important.

11:42:10 17          SPEAKER:  Thank you.

11:42:14 18          THE DEFENDANT:  I love you, baby.

11:42:53 19          SPEAKER:  Good afternoon.  My name is Rashanda.  And

11:43:01 20  I've been with him for about 15 years.  But before he and I even

11:43:08 21  started dating, we were friends.  I'd like to start today just by

11:43:22 22  saying that Duane has always -- he has always been a person that

11:43:28 23  enjoys helping others in any way possible.  Duane has always been

11:43:34 24  a family man.  He derives from an enormously huge family in which

11:43:43 25  majority is here in Austin.  Duane has come a really, really long

11:43:48  1  way.  He is not everything that people perceive him to be.  Duane

11:43:58  2  has had a lot of trials and tribulations in his life.  It's

11:44:04  3  really amazing that he is as strong as he is.

11:44:09  4          As a young child, he has endured the loss of a younger

11:44:14  5  sister and whom he was extremely close to.  Grandparents and

11:44:20  6  aunts, as well, at a young age.  Unfortunately for Duane, he did

11:44:25  7  not just lose a sister.  From my understanding he was there.  He

11:44:33  8  saw the entire accident happen right before his eyes.  And as a

11:44:38  9  human being, I'm sure that you can understand how this tragedy

11:44:41  10  has taken a stressful toll on him as a child.  After this

11:44:47  11  incident, his mother was immediately diagnosed with a chronic

11:44:51  12  illness while she was still grieving the loss of her daughter.

11:44:55  13          Duane, being the oldest of five, pushed all his sadness

11:44:59  14  and all his pain aside without counseling or any help.  At this

11:45:05  15  point in his life, he had no choice but to be the best big

11:45:08  16  brother, the best son he can be by being strong for his entire

11:45:13  17  family.  As he grew older, he stood stronger.  Duane was

11:45:18  18  determined to make it to college and play football for the NFL.

11:45:24  19  Fortunately, he had received a scholarship to Oklahoma State

11:45:28  20  University right out of high school and went on to play ball.  As

11:45:32  21  he excelled, he pushed for the best.

11:45:36  22          Through all of this, his mother fell sick again.  Being

11:45:39  23  the man he was, he felt it was his duty to be closer to home for

11:45:43  24  his mother, so he left school.  He was determined to make it.  He

11:45:49  25  was offered an opportunity to play football in California, and

11:45:53  1   his mom pushed for him to go.  Once again, Duane excelled.  He

11:45:56  2   was an honor student, a team player as well as a father by this

11:46:01  3   time.  He had had our first daughter.  He finished his two years

11:46:06  4   and still was determined to succeed.  Duane moved back to Austin

11:46:10  5   for a while and then, was blessed with another opportunity to

11:46:12  6   play for Abilene Christian University, which is a very highly

11:46:16  7   accredited college.  By this time we had had our second daughter,

11:46:21  8   and I was so proud of him still, withstanding it all.

11:46:25  9           In life, we all make mistakes, but without the correct

11:46:29  10  guidance, who are we to blame?  Our parents, our friends, our

11:46:34  11  loved ones?  No.  We just make decisions based on our

11:46:39  12  surroundings and thoughts of having a better life for our

11:46:42  13  families.  Duane and I share three children, two girls who love

11:46:51  14  their father more than anything, and one son, which is the new

11:46:57  15  and improved version of his dad.  Duane needs to be a part of

11:47:01  16  their lives and to lead his children in the right direction.  He

11:47:07  17  is a great man, a great father, a great friend, brother, lover,

11:47:13  18  and cousin.

11:47:14  19          Duane has endured a lot with perseverance.  And if you

11:47:18  20  choose to give him a second chance, I believe that he could do

11:47:21  21  it.  I would just like for you to know that although ultimately

11:47:25  22  he has made a few bad decisions, his all-around character has

11:47:32  23  good intentions or just taking care of his family the best way

11:47:35  24  that he know how.  And I just want to say thank you for giving us

11:47:40  25  the opportunity to speak.  And I want Duane to know that I love

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

| | | |
|---|---|---|
| 11:47:46 | 1 | him and I support him any way that I can. |
| 11:47:52 | 2 | THE COURT:  Thank you, ma'am. |
| 11:48:19 | 3 | MR. REAGAN:  Morning.  My name is Leslie Reagan, and I |
| 11:48:23 | 4 | coach at Reagan High School, and I had an opportunity to coach |
| 11:48:26 | 5 | Duane when he was in high school.  And I would like to say that |
| 11:48:31 | 6 | I've heard a lot of stuff here this morning, negative things and |
| 11:48:34 | 7 | a lot of positive things.  And I would like to say -- I would |
| 11:48:37 | 8 | like to add that Duane had more positive things going for himself |
| 11:48:40 | 9 | than negative.  And some of the stuff, I'm totally shocked and |
| 11:48:46 | 10 | surprised to hear, you know, that was said here today.  But I |
| 11:48:49 | 11 | don't know much about the negative side.  I just want to speak on |
| 11:48:52 | 12 | behalf of the positive side. |
| 11:48:54 | 13 | And I would like to say that Duane was a good student, |
| 11:48:57 | 14 | you know, never had any problem with grades, never had any |
| 11:49:00 | 15 | problem with the coaches or the teachers.  Very popular at |
| 11:49:06 | 16 | school.  That's the Duane that I know.  And he was always on time |
| 11:49:10 | 17 | for practice, you know, showed up and he just loved sports, |
| 11:49:14 | 18 | especially football.  And we, as coaches, were very proud of him. |
| 11:49:18 | 19 | You know, when we heard all this other negative stuff, just |
| 11:49:21 | 20 | couldn't believe it, you know.  And you know, we would think |
| 11:49:25 | 21 | that, you know, a lot of that stuff had been out there for us to |
| 11:49:27 | 22 | hear.  That's why it was so hard for us to believe it because we |
| 11:49:31 | 23 | weren't hearing all this stuff, you know. |
| 11:49:32 | 24 | And I would like to say that, you know, hopefully the |
| 11:49:40 | 25 | sentence that he's going to receive is light because he does, you |

| | |
|---|---|
| 11:49:46 | 1 |
| 11:49:54 | 2 |
| 11:49:59 | 3 |
| 11:50:04 | 4 |
| 11:50:07 | 5 |
| 11:50:11 | 6 |

know, he does -- he needs an opportunity to have a chance to

prove to the community and to his friends, us as coaches, that he

can, you know, be successful in life and do the right thing.

We've always done it.  I mean we've all had, you know, problems

if our life.  We make mistakes and we've overcome them, and

hopefully Duane can overcome.

His two daughters that were up here, I had an

opportunity to coach them in my summer youth program, as well.

Duane was involved in that for a while.  He would come out and

make donations and stuff to the kids, talk to his kids, even

before his kids was involved.  And then, after that, he had kids

of his own.  He was still there.  He ran the practice every day.

And I admired that about him because, you know, as you know,

Duane was without his dad, so he's trying to make a difference in

these kids' life, trying to be there for them.

But anyway, I would just like to say that hopefully you

could take in consideration some of the positive things that was

said today.  Thank you for giving me an opportunity to speak.

THE COURT:  Thanks, coach.

Mr. Blackerby, Mr. Hosea, come up.  Anything further

that you would like to say?

MR. BLACKERBY:  Your Honor, no.  Just, again, we would

ask the Court to grant the government's motion.

THE COURT:  I will grant the motion.  I've signed an

order and I'll have Ms. Sims enter the order.

11:51:35  1      Mr. Hosea has done a lot of things in his lifetime,
11:51:43  2  some right, some not right; but one of the things he's tried to
11:51:47  3  do is try to help himself under these circumstances.  And he's
11:51:50  4  gone from a pretty certain life sentence to a long sentence, but
11:51:57  5  he'll still be 12, 15 years younger than I am when he gets out.
11:52:05  6  He's got a lot of life still in him and he's got a lot of
11:52:09  7  abilities.  When I read his presentence report, I was amazed at
11:52:13  8  his achievements.
11:52:14  9      Like the coach, I can't figure out what happened
11:52:19  10  because I see both sides.  Doesn't mean that he's a bad person.
11:52:24  11  I've said that so many times up here.  Just made bad decisions
11:52:29  12  but really bad decisions in this particular case.  Gone from a
11:52:37  13  possible life sentence to a guideline sentence of 405 months to a
11:52:45  14  recommendation of 210 to 262 months by the government if they
11:52:50  15  hadn't filed the 5K motion, although Mr. Hosea obviously was
11:52:57  16  entitled to it or they wouldn't have filed it.  I don't know what
11:53:02  17  he did or occurred, but they have roughly given me the
11:53:07  18  opportunity to sentence him about half of what he would have
11:53:13  19  normally had.  But then, of course, he has to pay the price.
11:53:18  20      I sentence him on Count 1 to 240 months.  On Count 2,
11:53:24  21  is 84 months consecutive for a total of 324 months.  He'll have
11:53:35  22  on Count 1, five-year term of supervised release when he gets
11:53:43  23  out, on Count 2, three for a concurrent five-year supervised
11:53:52  24  release.  There will be no fine in the case.  He will, because of
11:53:56  25  the nature of the offense, have the testing within 15 days of his

11:54:02    1    release as mandated by the Congress to make sure that he does

11:54:06    2    not, although I don't have much history that he has consumed

11:54:10    3    drugs, but he will be tested for drugs on that occasion and

11:54:15    4    periodically through the term of supervised release.  He'll take

11:54:20    5    no illegal drugs, he'll drink no alcohol.  He'll release any and

11:54:23    6    all financial information as requested by the United States

11:54:28    7    probation officer, and will give his signature to obtain the

11:54:31    8    information, if necessary, to ensure he never goes back into the

11:54:36    9    selling of drugs.

11:54:41    10           I'm not going to put him in the Workforce Development

11:54:47    11   Program.  Mr. Hosea, you're plenty smart to get your own job and

11:54:52    12   work.  I'm not going to put you there.  By the time you get out,

11:54:57    13   I expect you'll finish your college degree and get a degree.

11:55:02    14   I've had people I've sentenced not only get their undergraduate

11:55:06    15   degree but master's degrees and one to get a Ph.D.

11:55:12    16           THE DEFENDANT:  Mr. Sparks.

11:55:13    17           THE COURT:  When you get out, we'll give you some help,

11:55:15    18   but you've got the ability to stand on your own two feet, and I

11:55:17    19   hope you will do that.  All other terms and conditions of the

11:55:22    20   standing order for supervised release will be in full force in

11:55:28    21   this case.  I'm not going to impose any fine in the case, simply

11:55:33    22   because it will just be harder on your family, but I do impose

11:55:40    23   the $100 mandatory assessment for each felony for a total of

11:55:44    24   $200, which you must pay or work off at your earliest

11:55:49    25   opportunity.

11:55:49   1          And I declare pursuant to your plea agreement all of

11:55:53   2   your right, title and interest to the following properties

11:55:57   3   forfeited to the government:  Marlin, Glenfield Model 75, .22

11:56:02   4   caliber, single-shot rifle, Serial No. 25340073; a Rossi Model

11:56:11   5   351, .38 caliber, five-shot revolver, Serial No. XG19059; a

11:56:19   6   Norinco Model 320, nine-millimeter, semiautomatic short-barreled

11:56:23   7   rifle, Serial No. MSA10087, with two magazines containing 51

11:56:31   8   rounds of nine-millimeter ammunition; a Model 20 HPX Point Blank

11:56:37   9   body armor, which includes a front panel, with Serial No.

11:56:43  10   3892050614, and the back panel, with Serial No. 3892050666; a

11:56:52  11   Taurus, Model PT111, nine-millimeter pistol, bearing Serial No.

11:56:58  12   TRL00514; a Jimenez Arms Model JA 9-CA, nine-millimeter Luger, SA

11:57:08  13   pistol, Serial No. 011055, with magazine and ammunition loaded; a

11:57:18  14   drum-type magazine for an AK-47-type rifle with 100-round

11:57:23  15   capacity; a Glock Model 19, nine-millimeter DAO pistol, Serial

11:57:29  16   No. LZT026, with a magazine containing 31 rounds of

11:57:35  17   nine-millimeter ammunition; Remington ammunition for the 52 R-P,

11:57:42  18   nine-millimeter Luger and all live cartridges; a Norinco Model

11:57:49  19   NHM91, caliber 7.62-by-39-millimeter, semiautomatic rifle, Serial

11:57:55  20   No. 920 -- 9211680, and; a Glock Model 19, nine-millimeter,

11:58:04  21   semi-automatic pistol with laser sight, Serial No. EKW627, with

11:58:10  22   31-round magazine that contained 15 live rounds at the time of

11:58:15  23   the seizure.

11:58:18  24          I am going to seal the presentence report.  I have

11:58:22  25   already attached the nice letters that I have received both today

| | | |
|---|---|---|
| 11:58:25 | 1 | and in the past.  Nobody can come in and read about you unless |
| 11:58:31 | 2 | you authorize them to do so with two exceptions:  The first is, |
| 11:58:38 | 3 | in the event of any appeal, it becomes part of the record; and |
| 11:58:42 | 4 | the second is that the government may use their copies for |
| 11:58:44 | 5 | official purposes.  Other than that, the personal information |
| 11:58:47 | 6 | will remain sealed. |
| 11:58:49 | 7 | My last obligation to you, Mr. Hosea, is to tell you |
| 11:58:53 | 8 | that you have ten days, and ten days only, from this date to file |
| 11:58:56 | 9 | a notice of appeal if you wish to contest any of the sentence or |
| 11:59:01 | 10 | any of the convictions in this case.  Your plea agreement may |
| 11:59:06 | 11 | have waived your right to file an appeal.  Your lawyer will go |
| 11:59:12 | 12 | over that, tell you what the options are.  He will give you his |
| 11:59:17 | 13 | recommendation.  Mr. Blackerby's a good lawyer, listen to him, |
| 11:59:21 | 14 | but you must make that decision.  If you tell him to file a |
| 11:59:24 | 15 | notice of appeal, even though he may recommend against it, |
| 11:59:29 | 16 | because you don't want to breach your plea agreement, it would |
| 11:59:33 | 17 | seem, but if you decide to appeal, all you have to do is tell |
| 11:59:38 | 18 | him.  He's obligated to file it.  But you must do it within ten |
| 11:59:42 | 19 | days or you waive that right.  You lose it.  Do you understand |
| 11:59:44 | 20 | that? |
| 11:59:45 | 21 | THE DEFENDANT:  Mr. Sparks, why you give me 84 months |
| 11:59:50 | 22 | for the gun?  I didn't even brandish the gun.  I didn't even |
| 11:59:53 | 23 | touch no gun.  I didn't even do it. |
| 11:59:55 | 24 | THE COURT:  Well, the statute gives you 84 months, and |
| 11:59:58 | 25 | the reason for it is there's no question that that victim was |

| | | |
|---|---|---|
| 12:00:03 | 1 | pistol-whipped, no question whatsoever.  He lost the bones above |
| 12:00:08 | 2 | and around his eye, he lost part of his skull. |
| 12:00:12 | 3 | THE DEFENDANT:  Mr. Sparks, I stand before you, he |
| 12:00:14 | 4 | wasn't.  He wasn't touched with the gun, man.  That's not right. |
| 12:00:18 | 5 | That's not justice.  I ain't touch him.  You know what I'm |
| 12:00:23 | 6 | saying? |
| 12:00:24 | 7 | THE COURT:  All right.  Ill remand Mr. Hosea and I'm -- |
| 12:00:27 | 8 | MR. BLACKERBY:  Your Honor, one other thing.  I didn't |
| 12:00:28 | 9 | address it, but we'd like you to recommend Bastrop or |
| 12:00:31 | 10 | someplace -- |
| 12:00:32 | 11 | THE COURT:  I will recommend Bastrop, but please tell |
| 12:00:35 | 12 | him, because he's upset now, please tell him he's going to have |
| 12:00:38 | 13 | to work with his counselor.  Because of the guns, they're not |
| 12:00:41 | 14 | going to send him to Bastrop for a while until they evaluate him, |
| 12:00:44 | 15 | and then, if they evaluate him where he's no danger to anybody |
| 12:00:47 | 16 | else, he'll get into Bastrop.  But he'll have to work on that, |
| 12:00:51 | 17 | Mr. Blackerby.  And thank you for taking this case. |
| 12:00:53 | 18 | MR. BLACKERBY:  Thank you. |
| 12:00:54 | 19 | PROBATION OFFICER:  Your Honor.  I'm sorry.  You |
| 12:00:56 | 20 | mentioned that drug testing.  We would ask for drug counseling, |
| 12:01:00 | 21 | as well, while he's on supervision because he did -- |
| 12:01:03 | 22 | THE COURT:  I thought I did.  Not only drug counseling |
| 12:01:07 | 23 | but mental health counseling and alcohol counseling therapy, if |
| 12:01:13 | 24 | necessary. |
| | 25 | (End of proceedings.) |

1                           * * * * * *

2

3

4   UNITED STATES DISTRICT COURT)

5   WESTERN DISTRICT OF TEXAS    )

6

7      I, LILY I. REZNIK, Official Court Reporter, United States

8   District Court, Western District of Texas, do certify that the

9   foregoing is a correct transcript from the record of proceedings

10   in the above-entitled matter.

11      I certify that the transcript fees and format comply with

12   those prescribed by the Court and Judicial Conference of the

13   United States.

14      WITNESS MY OFFICIAL HAND this the 1st day of October, 2010.

15

16

17                                 /s/Lily I. Reznik
                                   LILY I. REZNIK, RPR, CRR
18                                 Official Court Reporter
                                   United States District Court
19                                 Austin Division
                                   200 W. 8th Street, 2nd Floor
20                                 Austin, Texas 78701
                                   (512)916-5564
21                                 Certification No. 4481
                                   Expires:  12-31-12
22

23

24

25